UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT WATTS, on behalf
of himself individually and
all others similarly situated,

        NO. CIV. S-08-1877 LKK/GGH

     Plaintiff,

   v.

        O R D E R

ALLSTATE INDEMNITY CO.,
an Illinois corporation, et al.,

     Defendants.

_____/

    Plaintiff brings a class-action lawsuit against Allstate Indemnity Company ("Allstate") for five causes of action: Breach of Contract, Bad Faith, Breach of Implied Covenant of Good Faith and Fair Dealing, Fraud/Misrepresentation, and Unfair Competition.[1] Plaintiff has not yet moved for class certification. The claims arise from Allstate's alleged practices regarding seatbelt inspection, replacement, and/or repair after cars covered by

_____

[1] The court previously dismissed plaintiff's RICO claim. See March 31, 2009 Order, ECF No. 66.

1

Allstate's insurance policies are involved collisions. Defendant Allstate has moved for Summary Judgment on all claims or partial summary judgment of plaintiff's Second Amended Complaint ("SAC"). Plaintiff opposes the motion. For the reasons stated below, defendant's motion is GRANTED.

## I. Factual Background

Plaintiff Robert Watts purchased a car insurance policy from defendant Allstate Indemnity Company ("Allstate") in 2004. Depo. of Robert Watts ("Watts Depo") 19:7-14, Ex. B of Defs.' Mot. for. Summary J., ECF No. 202-2. The policy provides that "Allstate will pay for direct and accidental loss to [plaintiff's] insured auto . . . from a collision." Allstate Auto Insurance Policy ("Policy") 18, Pl.'s Ex. A, ECF No. 211-1. The Policy further provides that "any person making claim must give [Allstate] written proof of loss. It must include all details reasonably required by us. We have the right to inspect the damaged property. We may require any person making claim to file with us a sworn proof of loss. . ." Id. at 22. The Policy also contains an Appraisal Clause, which specifies:

> Both [plaintiff] and Allstate have a right to demand an appraisal of the loss. Each will appoint and pay for a qualified appraiser. Other appraisal expenses will be shared equally. The two appraisers, or a judge of a court of record, will choose an umpire. Each appraiser will state the actual cash value and the amount of loss. If they disagree, they'll submit their differences to the umpire. A written decision by any two of these three persons will determine the amount of the loss."

Id. at 21. Finally, the policy states that "no one may sue [Allstate] under this coverage unless there is full compliance with

2

1   all the policy terms." Id. at 22.

2        On March 29, 2006, plaintiff's 2005 Honda Civic was involved

3   in a collision while it was being driven by plaintiff's wife.

4   Second Amended Complaint ("SAC") ¶ 39. During the accident, both

5   the driver and the front-seat passenger were restrained by their

6   seat belts. As a result of the accident, the front seat passenger

7   suffered a fractured rib, and the driver suffered from serious neck

8   injuries. Pl.'s Opp'n 2, ECF No. 238. At the time of the collision,

9   plaintiff was insured under the car insurance policy issued by

10  Allstate. Id. Following the accident, plaintiff arranged for the

11  vehicle towed to Artistic Collision, a garage of plaintiff's own

12  choosing, and not part of Allstate's direct repair programs. Watts

13  Depo 31:15. On March 30, 2006, Artistic Collision Shop Manager

14  Bryan Welsh prepared a "visible damage quote." Depo. of Bryan Welsh

15  ("Welsh Depo") 14:11-14. Ex. C of Defs.' Mot. for. Summary J., ECF

16  No. 202-4.[2] The visible damage quote did not include any amount for

17  inspection, repair, or replacement of the seatbelts. Mr. Welsh

18  testified that did not recall inspecting the seatbelts. Id. at 17.

19       Plaintiff then presented a claim to Allstate for repairs to

20  the vehicles. On March 31, 2006, Allstate adjuster Elio Lencioni

21  prepared an estimate for the repair. Mr. Lencioni's estimate did

22

----

23       [2]Plaintiff disputes that Mr. Welsh prepared the visual
    inspection report. However, upon a review of the record, the court
24  concludes that Mr. Welsh did prepare the quote: "Q: Then, back to
    Exhibit 1, which is the visible damage quote you prepared, that was
25  prepared on March 30th, 2006; correct? A: Correct." Decl. of Bryan
    Welsh ("Welsh Depo") 14:11-14. Ex. C of Defs.' Mot. for. Summary
26  J., ECF No. 202-4.

1   not include any amount for inspection or repair of plaintiff's

2   seatbelts, although Lenocioni testified that it would have been his

3   custom and practice to inspect the seatbelt for "fraying, twisting,

4   any deformation, any stitching that was coming loose," to "pull

5   [the seatbelt] hard to see if it locks," to see if it goes back to

6   where it is supposed to go. And then to insert it in the buckle

7   make sure that it inserts in the buckle and it releases from the

8   buckle, . . . as it's supposed to." Depo. of Elio Lencioni 148,

9   Def.'s Ex. D. Mr. Lencioni stated that several circumstances would

10  prompt him to conduct the type of inspection describe above,

11  including any time there was "significant front-end damage" to the

12  vehicle, and "if it's a significant impact of any kind." Id. at

13  143-144. Mr. Lencioni clarified that "a significant impact would

14  be. . . a hard hit," and stated that if he saw that kind of impact,

15  he "would look at the seatbelts." Id. at 144:12-18.

16      Artistic Collision then repaired the car in accordance with

17  Mr. Lencioni's estimate. Artistic Collision did not replace the

18  vehicle's seatbelts. Allstate then paid Artistic Collision for the

19  repairs. Welsh Depo 24.

20      At some point in between the time of the accident and

21  September 18, 2007, plaintiff reviewed the owner's manual issued

22  by Honda for his vehicle. Watts Depo 75:13. In the owner's manual,

23  plaintiff read that seatbelts should be replaced in all vehicles

24  involved in serious collisions. Watts Depo 83:6. On September 18,

25  2007, plaintiff sent a letter to Allstate that stated, among other

26  things, "we have several concerns that we believe need further

4

repair. . . this was a major frontal impact. The damage to the car exceeded $6500 and both driver and passenger sustained injuries. The airbags did not deploy and we are requesting that the airbag sensors be inspected to ensure that they are operating correctly. We are also requesting that the seatbelt tensioners be replaced." Watts Depo 66:8-13, Ex. 27 ("September 18 Letter").

In response, Allstate adjuster Tina Parker directed plaintiff to contact Artistic Collision or the Bureau of Automotive Repairs.

Plaintiff filed his complaint in this action on February 29, 2008. On April 30, 2008 Allstate demanded an appraisal of the loss pursuant to the Appraisal Clause in the Policy. Martin Decl. Ex A 2, Ex. 1.

In May, 2008, plaintiff took his vehicle to the Elk Grove Honda dealership to have the seatbelts replaced based on the recommendation in the Honda Owner's Manual. Watts Depo. 84:1-7. Mr. Watts did not ask the dealership to inspect the seatbelts before replacing them. Id. at 84. Plaintiff paid the Honda dealership $1029 to replace the seatbelts, and was not reimbursed for the cost by Allstate.

In addition to the specific facts surrounding plaintiff's collision and his claim to Allstate, plaintiff alleges that Allstate had a general scheme or policy to "increase profitability by refusing to replace, repair, or inspect seatbelts in it's policyholders' vehicles that were damaged and made unsafe in automobile collisions." SAC 5:1-2.

////

## II. Standard for Summary Judgment

Summary judgment is appropriate when there exists no genuine issue as to any material fact. Such circumstances entitle the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995). Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish the existence of a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853. In doing so, the opposing party may not rely upon the denials of its pleadings, but must tender evidence of specific facts in the form of affidavits and/or other admissible materials in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); see also First Nat'l Bank, 391 U.S. at 289. In evaluating the evidence, the court draws all reasonable inferences from the facts before it in favor of the opposing party. Matsushita, 475 U.S. at 587-88 (citing United States v. Diebold,

1    Inc., 369 U.S. 654, 655 (1962) (per curiam)); County of Tuolumme
2    v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).
3    Nevertheless, it is the opposing party's obligation to produce a
4    factual predicate as a basis for such inferences. See Richards v.
5    Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The
6    opposing party "must do more than simply show that there is some
7    metaphysical doubt as to the material facts . . . . Where the
8    record taken as a whole could not lead a rational trier of fact to
9    find for the nonmoving party, there is no 'genuine issue for
10   trial.'" Matsushita, 475 U.S. at 586-87 (citations omitted).

11                           **III. Analysis**

12        In essence, plaintiff's claim is that Allstate's auto
13   insurance policy obligates Allstate to replace seatbelts that were
14   in use during a serious collision, whenever the vehicle's owner's
15   manual recommends such replacement. Plaintiff argues that
16   Allstate's failure to pay to replace seatbelts in such
17   circumstances constitutes breach of contract, insurance bad faith,
18   fraud, and unfair competition.

19   **A. Breach of Contract**

20        Plaintiff alleges that there existed a valid contract between
21   plaintiff and Allstate, that plaintiff performed all of his duties
22   under the contract, that defendant breached its duty to pay to
23   return plaintiff's insured vehicle to its pre-accident condition
24   by not paying for the cost of inspecting and replacing the
25   seatbelts, and that plaintiff suffered damages in the amount of
26   $1029 due to defendant's breach.

1    Plaintiff must show that the four elements of a breach of
2    contract claim are met, namely: "(1) the contract, (2) plaintiff's
3    performance or excuse for nonperformance, (3) defendant's breach,
4    and (4) the resulting damages to plaintiff." Reichert v. General
5    Ins. Co., 68 Cal. 2d 822, 830 (Cal. 1968). Defendant does not
6    dispute that the auto insurance policy purchased by plaintiff in
7    2004 was a valid contract between the parties. Thus, the court
8    analyzes whether the defendant is entitled to summary judgment
9    based on the three remaining elements of the breach of contract
10   claim.

11   **i. Whether Plaintiff performed his obligations or was excused from**
12   **doing so.**

13   Under the policy, plaintiff was obligated to pay premiums and
14   to notify Allstate of claims for loss to the insured auto. The
15   policy required plaintiff to provide written proof of loss along
16   with his claim. There is no dispute that plaintiff paid his
17   premiums. Defendant argues that plaintiff never made a claim for
18   seatbelt inspection or replacement. Plaintiff contends that his
19   initial claim following the accident served as notice of his claim
20   for seatbelt inspection and repair, and that he made another claim
21   on September 18, 2007, when "subsequently, upon discovering that
22   the seatbelts were not replaced, Plaintiff sent a letter to
23   Allstate requesting that the seatbelt tensioners in his vehicle be
24   replaced." Pl.'s Opp'n 7:6-8. Defendant does not dispute that the
25   initial communication regarding the accident, which resulted in the
26   preparation of a Visual Damage Quote by Artistic Collision and a

1  cost estimate by Allstate adjuster Lencioni, was a "claim" under
2  the policy. Rather, defendant argues that the initial claim did not
3  create an obligation to pay for replacement of the seatbelts since
4  the seatbelts were not damaged in the accident.

5      Defendants deny that the September 18 letter to Allstate
6  constituted a claim to have the seatbelts replaced. That letter
7  stated, in relevant part, "Finally, this was a major frontal
8  impact. The damage to the car exceeded $6,500, and both driver and
9  passenger sustained injuries. . . We are also requesting that the
10 seatbelt tensioners be replaced." September 18 Letter, Ex. H to
11 Pl.'s Ex. A. Decl. of Wendy York. Allstate construed the letter not
12 as a claim, but as a complaint about the work done by Artistic
13 Collision. Depo. Of Tina Parker, Def.'s Ex. F 122.  Allstate
14 employee Tina Parker then sent plaintiff a letter recommending that
15 he contact Artistic Collision or the Bureau of Automotive Repairs.
16 Def.'s Ex. F, A0336 ("Tina Parker letter"). Plaintiff argues that
17 Tina Parker's letter constituted a denial of a claim to have the
18 seatbelt tensioners replaced.

19     Under California law, a "notice of claim means any written or
20 oral notification to an insurer or its agent that reasonably
21 apprises the insurer that the claimant wishes to make a claim
22 against a policy or bond issued by the insurer and that a condition
23 giving rise to the insurer's obligations under that policy or bond
24 may have arisen." Cal. Code Regs. tit 10 § 2695.2. The court finds
25 that both instances meet this definition of claim. As noted above,
26 however, the Policy required plaintiff to give written proof of

1  loss to Allstate, along with his claim. Policy 22. Plaintiff did

2  not submit any proof of loss related to the seatbelts, before or

3  after he had them replaced by Elk Grove Honda. Plaintiff's

4  notifications of his claim to Allstate in March 2006 and September

5  2007 did not necessarily create an obligation on the part of

6  Allstate to pay for the replacement of the seatbelts.

7  **ii. Whether Allstate breached its obligations under the policy by**

8  **not paying for the cost of replacing the seatbelts.**

9       Allstate's obligations with respect to plaintiff's vehicle

10  following the March 29 collision are encapsulated in the "Coverage

11  DD" section of the Policy. Allstate is obligated to "pay for direct

12  and accidental *loss* to [plaintiff's] insured auto. . . from a

13  collision with another object." Policy 18. Allstate reserves the

14  option of "pay[ing] for the *loss* in money," or "repair[ing] or

15  replac[ing] the *damaged* property." Policy 21 (emphasis added).

16  Further, the Policy limits Allstate's liability to "the actual cash

17  value of the property or damaged part of the property at the time

18  of loss." Policy 22.

19       In the SAC, plaintiff alleges that after the accident, the

20  seatbelts were damaged: "the webbing of the seatbelts was elongated

21  rendering the seatbelt ineffective in an subsequent condition," SAC

22  20:27-28, that plaintiff "sent a letter to Allstate requesting

23  Allstate to replace the seat belts and tensioners in his vehicle,"

24  SAC 15:26-28, and that "Allstate refused to provide coverage to

25  replace the damaged, post-collision seat belts and tensioners in

26  plaintiff's vehicle, leaving the vehicle unsafe and not in its pre-

accident condition." SAC 21:3-6. Allstate's conduct, according to plaintiff, was a breach of its obligations under the insurance policy purchased by plaintiff.

In a prior order, this court denied defendant's motion to dismiss, holding that because it alleged "actual damage to the seatbelt," plaintiff's complaint could be distinguished from similar complaints that had been dismissed by the Fifth and Sixth Circuits. March 31 Order, ECF No. 66. In Sonnier v. State Farm Mut. Auto Ins. Co., 509 F.3d 673 (5th Cir. 2007), for example, plaintiffs had alleged that the insurance company had a duty to inspect the seatbelts after an accident. The court held there that "[i]f there were actually something wrong with the seatbelts, it would be arguable that State Farm would have to pay for the tests necessary to determine just what that was and how to fix it as part of the costs of repairing the seatbelt." Id. at 674, 676. But since the plaintiffs in that case did not allege that there was anything wrong with the seatbelts, the Fifth Circuit upheld the dismissal of plaintiff's breach of contract claim. This court concluded that the Sonnier reasoning did not apply in the instate case because plaintiff had alleged actual damage to the seatbelts. Thus, the court denied defendant's motion to dismiss the breach of contract claim. Order 14, March 31, 2010, ECF No. 66.

Now, however, plaintiff is confronted with evidence that, following the accident, the "seatbelt assemblies were in superb condition." Decl. of Daniel Davee in Supp. Def.'s Mot. for Summ. Judgment ("Davee Decl.") 4:15-16, Def.'s Ex I. Defendant's expert,

11

a specialist in "automotive restraint performance as it relates to seat belt assemblies and supplemental occupant restraint systems," id. at 2, inspected each component of the seatbelts that were in use plaintiff's car at the time of the accident. Mr. Davee stated that "the subject seat belt web (driver and passenger) is not elongated or permanently distorted. Any minor change in web length. . . will have negligible effect in the effectiveness of the seatbelt assembly. . ." Id. at 6. Mr. Davee further testified that "the anchors were not deformed and would not affect the effectiveness of the seat belt assembly in any way," that, with respect to the retractor locking mechanism, "inertia sensing, web sensing, and tilt lock features all function without issue," and that "the effectiveness of the seat belt tensioners to mitigate injury in a subsequent accident was unchanged since they were found operational and fully functional." Id. 7-9.[3]

Plaintiff cites two pieces of evidence in an attempt to rebut defendant's expert testimony. See Pl.'s Response to Def.s' Statement of Undisputed Facts ¶44. The first citation is to excerpts from plaintiff's wife's deposition. In that deposition, Geanina Watts stated "[a]fter I had been in the accident, I remember one time [the seatbelt] it got stuck on me. . . it was

---

[3] Plaintiff objects to Mr. Davee's testimony as after-acquired evidence, saying that the conclusions from an inspection of the plaintiff's seatbelts that took place more than three years after the claim is irrelevant to whether Allstate acted in good faith in response to plaintiff's claim. Pl.'s Evidentiary Objections 14, ECF No. 240-1. The after-acquired nature of Mr. Davee's conclusions, however, do not diminish their relevance to plaintiff's Breach of Contract claim.

1  constant speed and it just got stuck so I had to unlatch it because
2  it was very tight on me. So I was wondering if that was normal, and
3  so I remember a few times it was very loose and not go back. So I
4  wanted to know if that was normal." G. Watts Deposition 25, Ex. H
5  to Pl.'s Ex C. The second citation is to a declaration by
6  plaintiff's expert James Mathis, in which Mr. Mathis simply cites
7  Mrs. Watts' testimony that the seatbelts were damaged. Based on
8  this testimony by Mrs. Watts, Mr. Mathis concluded: "Following the
9  collision, the seatbelts in Plaintiff's vehicle were damaged."
10 Decl. of James Mathis in Supp. of Pl.'s Opp'n to Summ. J. ¶ 61
11 (citing the G. Watts deposition). Mr. Mathis is a former Allstate
12 employee whose relevant expertise consist of having been trained
13 to use Allstate's internal computer programs for processing claims.
14 Mr. Mathis does not claim to have technical expertise, nor does he
15 claim to have inspected the seatbelts. Mr. Mathis' declaration does
16 not effectively rebut defendant's expert's conclusion that the
17 seatbelts were not damaged in the accident.  Finally, Mrs. Watts'
18 subjective concerns do not raise a triable issue.

19     Having concluded that there remains no genuine issue as to
20 whether the seatbelts were damaged in the accident, the court turns
21 to whether the defendant breached its obligations by failing to pay
22 to have the seatbelts replaced even if they were undamaged.
23 Plaintiff argues that Allstate was obligated to adhere to the
24 recommendations in the owner's manual when determining the cost of
25 "loss" to the automobile, and that in this case, those
26 recommendations required replacement of the seatbelts following an

1   accident. Pl.'s Opp'n 11. Plaintiff argues that the cost of

2   replacing the seatbelts was part of the "loss" to the insured auto

3   resulting from the accident, for which defendant is required to

4   pay, even if the seat belts were not actually damaged in the

5   accident. Plaintiff points to the owner's manual for his vehicle,

6   which states: "If a seatbelt is worn during a crash, it must be

7   replaced by the dealer. A belt that has been worn during a crash

8   may not provide the same level of protection in a subsequent

9   crash." Pl.'s Opp'n 12. Plaintiff urges the court to construe the

10  contract as requiring Allstate to follow the owner's manual rather

11  than the vehicle service and repair manual, which, in the case of

12  plaintiff's car, apparently do not recommend seatbelt replacement.

13      Indeed, such an obligation may be present if the Policy is

14  ambiguous, and if the court concludes that Allstate believed that,

15  at the time the policy was purchased, the policyholder's

16  understanding was that Allstate would adhere to vehicle owner's

17  manual recommendations when paying to restore a vehicle to its pre-

18  accident condition. "An insurance policy provision is ambiguous

19  when it is susceptible of two or more reasonable constructions. If

20  ambiguity exists, however, the courts must construe the provisions

21  in the way the insurer believed the insured understood them at the

22  time the policy was purchased." Ameron Internat. Corp. v. Insurance

23  Co. of State of Pennsylvania, 50 Cal. 4th 1370, 1378 (Cal.

24  2010)(internal citations ommitted).

25      Plaintiff argues that statements by Allstate's senior training

26  specialist, Thomas Perrett, as well as portions of the training

1  materials for auto adjusters, are evidence that Allstate believed
2  that it was obligated to defer to the owner's manual
3  recommendations when determining how to restore an insured car to
4  it's pre-loss condition. In his deposition, Mr. Parrett testified
5  that he trains Allstate's auto adjusters to follow vehicle
6  manufacturer's recommendations when estimating auto collision
7  repairs in order to ensure that the car is restored to its "pre-
8  accident condition." Depo. of Thomas Perrett ("Perret Depo.")
9  83:14-19. In their opposition brief and at oral argument, plaintiff
10  characterized Mr. Perrett's testimony as establishing that Allstate
11  adjusters are "instructed to refer to the *vehicle owner's manuals*
12  to determine the proper procedures to follow in regards to
13  inspection and replacement of seatbelts following a collision."
14  Upon review of the deposition transcript, however, the court finds
15  that no such conclusion is warranted. Mr. Parrett did testify that
16  I-CAR, the training program used by Allstate, trains auto adjusters
17  to follow the *vehicle manufacturer's recommendations* regarding
18  replacement of seatbelts. Perrett Depo. 91:24-91:3. He testified
19  that the "I-CAR recommendation is to follow the vehicle maker's
20  recommendations," id. 82:7-8, in order "to ensure that the car is
21  restored to its pre-accident condition." Id. 83:16-19. This
22  testimony standing alone is ambiguous as to which manual is being
23  referenced. Either Allstate trains its adjusters to refer to
24  manufacturer repair or service manuals, or to the *owner's* manuals.
25  Mr. Parret testified, however, that he had never "provided training
26  to the Allstate auto adjusters in an format. . . that references

15

the policyholder's owner's manual as a resource as to what repairs should be made." Id. 91:16-20.

Plaintiff also directs the court to exhibits purported to be portions of Allstate's training materials. Exhibit P to Wendy York's declaration, Pl.'s Ex A, appears to be a page from "Day Seven" of a "Vehicle Loss Technical Skills Workshop." It directs its readers "to locate more specific information on the seat belt in question [by] consult[ing] the service or owner's manual for that model."[4]  Exhibit S, purported to be a copy of "ATRL: Auto Technical Reference Library," however, states "the following information is provided to serve as general guidelines to follow when evaluating seatbelts for reuse after being used during a collision. When available, refer to the manufacturers *service* manual for specific information about the vehicle model being evaluated." Exhibit S to Decl. York, Pl.'s Ex A.[5] The court finds that the evidence provided by plaintiff does not establish that Allstate's own interpretation of its policy was that Allstate was obligated to adhere to the Honda owner's manual when determining

---

[4] To consult the owner's manual for additional information is hardly the equivalent of being bound by that manual.

[5] As is the case for much of plaintiff's evidence, neither Exhibit P or S is properly cited in plaintiff's opposition brief. Additionally, neither document appears to be properly authenticated. Ms. York stated in her declaration that Exhibit P is "a true and correct copy of relevant portions of Allstate's training material that reference owner's manufacturer's recommendations," something that Ms. York does not, as plaintiff's attorney, have personal knowledge of. The court did not find any declaration by plaintiff that the exhibits were produced by defendant in discovery

1   how to return plaintiff's vehicle to its pre-accident condition.

2        This conclusion is in accord with <u>Levy v. State Farm Mut.</u>

3   <u>Auto. Ins. Co.</u>, 150 Cal.App.4th 1(2007). In that case, the Court

4   of Appeal affirmed a lower court holding that the auto insurance

5   contract at issue "did not purport to obligate State Farm to follow

6   any particular industry standard, but required State Farm only to

7   'restore the vehicle to its pre-loss condition.'" In <u>Levy</u>, the

8   "complaint does not allege in what manner [plaintiff's] car after

9   repair differed from its pre-accident condition." In this case,

10  although plaintiff did allege that the seatbelts were actually

11  damaged in the accident, as already discussed, the plaintiffs have

12  failed to show that there is a genuine issue as to whether the

13  seatbelts were damaged. The <u>Levy</u> court rejected the plaintiffs'

14  attempt "to establish a link between the cited industry standards

15  and the policy's promise to restore the vehicle to preaccident

16  condition." <u>Id.</u> at 5.[6]

17        From all that appears, plaintiff's insurance policy did not

18  require Allstate to replace plaintiff's undamaged seatbelts

19  following the collision, and the court cannot construe the Policy

20  to require Allstate to adhere to the recommendations of the owner's

21  manual, when there is no evidence that Allstate intended to bind

22  itself to do so.

23

24        [6] District courts are not bound by decisions of state
    intermediate courts, <u>Dimidowich v. Bell & Howell</u>, 803 F.2d 1473
25  (9th Cir. 1986), but they are not free to disregard them in the
    absence of other authority. <u>West v. American Tel. & Tel. Co.</u>, 311
26  U.S. 223 (1940).

1    The court finds no issue of material fact as to whether
2    Allstate breached its obligations to plaintiff under the Policy.
3    Accordingly, defendant's motion for summary judgment on the breach
4    of contract claim is GRANTED.

5    **B. Bad Faith and Breach of the Covenant of Good Faith and Fair**
6    **Dealing**

7    Plaintiff's second and third causes of action are duplicative
8    of one another. Under California law, the "insurance bad faith,"
9    cause of action is simply a cause of action for breach of the
10   covenant of good faith and fair dealing in the insurance context.
11   Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1009
12   (9th Cir. Cal. 2004). As plaintiff asserts, "to establish a breach
13   of the implied covenant of good faith and fair dealing, plaintiff
14   must show that (1) benefits due under the policy were withheld; and
15   (2) the reason for withholding the benefits was unreasonable or
16   without proper cause." Pl.'s Opp'n 17 (citing Love v. Fire
17   Exchange, 221 Cal.App.3d 1136, 1150 (1990). As discussed above, no
18   policy benefits were withheld in this case. Defendants are
19   therefore entitled to summary judgment on plaintiff's second and
20   third causes of action, and defendant's motion is GRANTED.

21   **C. Fraud and Misrepresentation**

22   Plaintiff's fraud claim stems from allegations that Allstate
23   falsely represented to plaintiff and class members "it would
24   completely restore their post-collision Allstate-insured vehicles
25   to the vehicle's pre-accident safe condition." The representations
26   were allegedly false and known to be false because "Allstate

1  "implemented and exercised a corporate-wide policy to decline to
2  replace seatbelts that have been worn during a collision" during
3  the time that the representations were made SAC 24-25.

4       Defendant correctly states the elements of a fraud claim: "(a)
5  a misrepresentation, (b) knowledge of falsity, (c) intent to
6  defraud/to induce reliance, (d) justifiable reliance, and (e)
7  resulting damage." Def.'s Mot. 18 (citing Nagy v. Nagy, 210 Cal.
8  App.3d 1262, 1268 (1989).

9       Plaintiff claims that Allstate's representations that it would
10 restore insured vehicles to their pre-accident condition following
11 an accident were false. Plaintiff contends that at the time
12 Allstate was making such representations, it was implementing a
13 corporate-wide policy to refuse to test or replace seatbelts.
14 Plaintiff alleges that Allstate had no intention of honoring its
15 contractual responsibilities with regard to seatbelts. In general,
16 a breach of a promise, without more, is not fraud. "The basis for
17 a contract action is the parties' agreement; to succeed under the
18 consumer protection law, one must show not necessarily an
19 agreement, but in all cases, an unfair or deceptive practice.
20 American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995). See also,
21 Greenberger v. GEICO Gen. Ins. Co., 631 F.3d 392, 399 (7th Cir.
22 2011)("Greenberger alleges that GEICO never intended to restore
23 his car to its preloss condition and failed to disclose that it
24 regularly breaches this contractual promise. These are
25 breach-of-contract allegations dressed up in the language of fraud.
26 They cannot support statutory or common-law fraud claims."). Here,

1   the court has found that Allstate did not, in fact, breach its
2   obligations under the contract. Allstate's obligation to plaintiff
3   was to pay to have his car restored to its pre-accident condition.
4   Plaintiff has not shown that the condition of his car differed
5   before the accident and after it was repaired.  Allstate simply
6   made no representations either to the general public as part of its
7   marketing campaign, or to policy holders under the terms of the
8   agreement to pay to replace undamaged seatbelts following a
9   collision.
10       In this case, the court has previously held that proof that
11  "Allstate had an established and uniform policy of refusing to pay
12  for repairs to seatbelts," could support an inference that Allstate
13  entered into contract with the intent of not performing its
14  obligations. March 31, 2009 Order 21, ECF No. 66. Therefore, the
15  court looks for evidence of an established and uniform policy by
16  Allstate of refusing to pay for repairs to seatbelts. Defendant has
17  submitted a declaration by Allstate Claims Project Manager, who
18  stated that Allstate's "policy and practice is to pay for any
19  physical damage sustained by seatbelts in an insured vehicle as a
20  result of a covered collision. I estimate that Allstate has paid
21  to replace seatbelts on hundreds or thousands of first party auto
22  clams in California during the past five years." Decl. of Robert
23  Howell ¶ 3, ECF No. 204. In his response to defendant's statement
24  of undisputed facts, plaintiff disputes Mr. Howell's statement, and
25  state that Allstate has paid for inspection or replacement of seat
26  belts in fewer than 1.1% of the 135,000 claims submitted in

1  California each year. To support this proposition, plaintiff cites

2  "Defendants' Response to Special Interrogatories Number 2 and 3,"

3  but those documents do not appear in Plaintiff's Index of Evidence

4  in Support of Plaintiff's Opposition to Allstate's Motion for

5  Summary Judgment. The court is "not required to comb through the

6  record to find some reason to deny a motion for summary judgment."

7  Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1029 (9th Cir.

8  2001).

9      In fact, in his opposition to defendant's motion for summary

10  judgment, plaintiff does not cite *any* evidence of such a policy.

11  The only evidence cited in the "Fraud" section[7] of plaintiff's

12  opposition is a statement by an Allstate senior specialist and

13  trainer that "inspection of the seatbelt systems following a

14  collision would be covered in direct and accidental loss under the

15  policy." Pl.'s Opp'n 22 (citing Perrett Depo., 231:5-11).

16      Further, the plaintiff in this case cannot prove any damages

17  from Allstate's allegedly fraudulent statements. Plaintiff argues

18  that: "Allstate's fraudulent marketing materials induced Mr. Watts

19  to obtain an insurance policy with Allstate. Through said marketing

20  materials, Mr. Watts believed that should his vehicle be involved

21  in an accident, his vehicle, including his seat belts, would be

22  inspected and restored to a pre-loss condition." Pl.'s Opp'n 22:18-

23  _____

24      [7] This section of plaintiff's brief is entitled "Plaintiff's
   Complaint Alleges Allstate's Fraud and Misrepresentation with

25  Particularity." Plaintiff misunderstands his burden, given the
   procedural posture of the case. The court already held that

26  plaintiff's fraud claim was pled with particularity; the question
   now is one of evidence.

21. The evidence submitted by the parties shows that Mr. Watts' vehicle was indeed restored to its pre-loss condition. As discussed above, the seatbelts were undamaged.

Defendant's motion for summary judgment of plaintiff's claim for fraud is GRANTED.

**D. Unfair Competition**

California's Unfair Competition Law, ("UCL", Cal. Bus. & Prof. Code § 17200, proscribes "unlawful, unfair, or fraudulent business acts." This court's previous order dismissed plaintiff's UCL claim insofar as it was based on unlawful acts, but allowed plaintiff's UCL claim to proceed on the basis of unfair acts and fraudulent acts. March 31, 2009 Order 21-22.

**i. Fraudulent Acts**

For the reasons already discussed, the court concludes that there is no genuine issue of material fact as to whether defendant engaged in the fraudulent acts alleged by plaintiff. Accordingly, the defendant's motion for summary judgment is GRANTED with respect to plaintiff's UCL claim based on fraudulent acts.

**ii. Unfair Acts**

This court previously held that plaintiff stated a claim by alleging that defendant "unreasonably exerted their considerable influence to prevent third-party auto-repair shows from inspecting and repairing the seat belts in plaintiff's and class members' post-collision Allstate-insured vehicles." March 31, 2009 Order 23, ECF No. 66. The court held that plaintiff's allegations that Allstate interfered with independent repair shop's judgment and

1  placed consumers at risk was not fair as a matter of law.

2  Defendants now argue that there is no evidence that Allstate

3  exerted such influence over third party repair shops or interfered

4  with those shops' judgment. Def.'s Mot. Summ. J. 19. Plaintiff

5  cites the declaration of Ken Klein for evidence of Allstate's

6  influence over third-party shops and interference with those shops'

7  judgment. Decl. of Klein, Pl.'s Ex. B. In that declaration, Mr.

8  Klein describes general practices in the auto insurance industry,

9  as well as some practices particular to Allstate. Mr. Klein

10 describes the process that Allstate uses "to control the collision

11 repair process." For example, "if a shop does not accept Allstate's

12 estimate, Allstate will do all they can to transfer the vehicle to

13 one of their preferred shops that will conduct the repairs per

14 Allstate's estimate. If the vehicle is at a non-preferred shop, the

15 Allstate adjustor meets with the collision repair price and objects

16 to their price." Plaintiff does not allege or present any evidence

17 that Allstate followed this policy in his case. Allstate never

18 tried to get plaintiff's vehicle transferred to an Allstate-

19 preferred shop, and did not object to the estimate prepared by

20 Artistic Collision, Mr. Watts' shop of choice. Mr. Klein stated

21 that Allstate denied a supplemental estimate from Artistic

22 Collision, but that estimate was unrelated to the seatbelts.

23 Accordingly, the court finds that there is no genuine issue of

24 material fact as to whether defendant engaged in unfair competition

25 by exerting undue influence over and interfering in the independent

26 judgment of Artistic Collision with respect to the repair of

1  plaintiff's car, and defendant's motion for summary judgment on
2  that claim is GRANTED.

### IV. Conclusion

For the foregoing reasons, Defendant's motion for summary
judgment is GRANTED in its entirety.

IT IS SO ORDERED.

DATED:  May 11, 2011.


_____
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT