UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT WATTS, on behalf
of himself individually and
all others similarly situated,

           NO. CIV. S-08-1877 LKK/GGH

     Plaintiff,

  v.

           <u>O R D E R</u>

ALLSTATE INDEMNITY CO.,
an Illinois corporation, et al.,

     Defendants.

_____/

    Plaintiff Robert Watts brings this putative class action against defendants Allstate Indemnity Company, Allstate Insurance Company, and Allstate Property and Casualty Insurance Company (collectively, "Allstate" or "defendant"), alleging (i) breach of contract; (ii) insurance bad faith; (iii) breach of the implied covenant of good faith and fair dealing;[1] (iv) fraud/

---

[1] As the court has previously recognized, "the second and third causes of action are duplicative of one another." (Order, May 11, 2011, 18:7-8, ECF No. 255.)

1

misrepresentation; and (v) unfair competition under Cal. Bus. & Prof. Code sec. 17200.[2]

Plaintiff's claims arise from defendant's alleged misconduct in failing to adequately inspect and pay for the replacement of seatbelts damaged in collisions involving insured automobiles. Plaintiff now moves for class certification. Defendant moves to compel appraisal and stay this action.

The motion came on for hearing on January 14, 2013. Having considered the matter, for the reasons set forth below, the court will (i) deny defendant's motion to compel appraisal and stay the action, and (ii) deny plaintiff's motion for class certification.

**I. BACKGROUND**

    **A. Factual Background**

The following facts are taken from plaintiff Watts's declaration in support of class certification (Declaration of Robert Watts in Support of Plaintiff's Motion for Class Certification ("Watts Dec."), ECF No. 314) and his deposition transcript (Deposition of Robert Watts ("Watts Dep."), Appendix to Defendant's Motion for Summary Judgment Ex. B, ECF No. 202-2).

In 2006, plaintiff Watts was covered by an auto insurance policy purchased from Allstate. (Watts Dec. ¶ 2.) The policy provided that "Allstate will pay for direct and accidental loss to [plaintiff's] insured auto . . . from a collision . . . ." (Allstate Auto Insurance Policy ("Policy") 18, Watts Dec. Ex. A,

---

[2] The court previously dismissed plaintiff's sixth cause of action for RICO violations. (Order, March 31, 2009, ECF No. 66.)

2

1  ECF No. 314-1.) In the event of loss, Allstate could choose to "pay

2  for the loss in money, or [to] repair or replace the damaged or

3  stolen property." (Policy 21.)

4       On March 29, 2006, plaintiff's 2005 Honda Civic sustained

5  significant damage in a collision. (Watts Dec. ¶ 5.) Plaintiff's

6  wife was driving the Honda, and was accompanied by a passenger.

7  (Id.) Plaintiff had the vehicle towed to Artistic Collision, an

8  auto repair shop of his own choosing. (Watts Dec. ¶ 6; Watts Dep.

9  40:14-41:5.) Artistic Collision prepared a "visible damage quote"

10  which did not include any amount for inspection, repair, or

11  replacement of the seatbelts. (Watts Dec. ¶ 6; Watts Dep. Ex. 3.)

12  On March 31, 2006, an Allstate adjuster reviewed the visible damage

13  quote and authorized repairs at the cost of $6,534.77. (Watts Dec.

14  ¶ 7.) Allstate's estimate did not include any amount for

15  inspection, repair, or replacement of the seatbelts. (Id.) Artistic

16  Collision repaired the car in accordance with the estimate; the

17  final invoice did not include the cost of inspection, repair, or

18  replacement of the seatbelts. (Watts Dec. ¶ 8.) The bill for these

19  services was paid by Allstate. (Id.)

20       At some point between the date of the accident and September

21  2007, plaintiff reviewed the owner's manual for his Honda Civic.

22  (Watts Dep. 75:10-13, 83:1-8.) It provided that seatbelts should

23  be replaced in all vehicles involved in serious collisions. (Watts

24  Dep. 83:6-8.) Plaintiff wrote to Allstate requesting, among other

25  things, that the seatbelt tensioners be replaced in the Honda.

26  (Watts Dec. ¶ 10.) In its response, Allstate refused to cover the

3

1  replacement of the seat belts and seat belt tensioners, and

2  directed plaintiff to file a complaint with the California Bureau

3  of Automotive Repairs if he still had concerns. (Watts Dec. ¶ 11.)

4      In May 2008, after commencing this action, plaintiff had his

5  seatbelts replaced by Elk Grove Honda at a cost of $1029. (Watts

6  Dec. ¶ 12.)

7      **B. Procedural Background**

8      Plaintiff filed an initial complaint on February 29, 2008, and

9  an amended complaint on November 24, 2008. On November 7, 2008,

10 defendant filed a motion to dismiss and a motion to compel

11 appraisal. (ECF No. 53). The court granted the motion to dismiss

12 in part, and denied the motion to compel appraisal (ECF No. 66).

13 On April 20, 2009, plaintiff filed his Second Amended Complaint

14 ("SAC," ECF No. 67), which is the operative complaint in this

15 action.

16     On April 8, 2011, defendant filed a motion for summary

17 judgment. (ECF No. 201.) The court initially granted the motion in

18 its entirety. (ECF No. 255.) Plaintiff then filed a motion for

19 reconsideration, claiming excusable neglect for failing to cite to

20 the declaration of expert witness Sandy Browne, and arguing that

21 the contents of this declaration created a genuine issue of

22 material fact. (ECF Nos. 260, 266.) On March 30, 2012, the court

23 granted plaintiff partial relief from summary judgment, while

24 leaving unaltered the portion of its previous order holding that

25 the "insurance policy did not [in terms] require Allstate to

26 replace plaintiff's undamaged seatbelts following the collision."

1 (ECF No. 290.)

2      On May 4, 2012, defendant moved to strike the class

3 allegations in the SAC. (ECF No. 297.) The court vacated the

4 hearing on this motion, and instead ordered plaintiff to bring a

5 motion for class certification according to a briefing schedule set

6 by the court. (ECF Nos. 303, 308.)

7      Now pending before the court is plaintiff's motion to certify

8 a class of all persons:

9      (1) Who were issued, in California, by Allstate, an
       automobile insurance policy that included insurance
10      coverage;

11      (2) Who made a claim to Allstate for benefits under the
       policy as a result of a loss to their covered vehicle;
12
       (3) Whose policy was in full force and effect at the
13      time of the loss;

14      (4) Whose loss occurred from February 24, 2004 through
       the present;
15
       (5) Whose loss involved a collision of sufficient
16      severity to damage the seat belt systems in occupied
       seating positions; and
17
       (6) Whose seat belt systems Allstate did not pay to
18      replace. (Plaintiff's Motion for Class Certification,
       ECF No. 322.)
19

20 If certified, the class may include up to several hundred thousand

21 individuals, as, according to plaintiff's counsel Wendy York,

22 867,026 California policyholders submitted auto collision repair

23 claims to Allstate in the 2004 - 2009 period, of which only 1.2%

24 resulted in the replacement or repair of seatbelts or seatbelt

25 components. (Declaration of Wendy C. York in Support of Plaintiff's

26 Motion for Class Certification ¶¶ 29-31, ECF No. 332.) Allstate

1    opposes class certification. (ECF No. 335.)

2        The following motions are also pending before the court:

3    •    Allstate's request for an evidentiary hearing on factual
         disputes relating to class certification between
4        plaintiff's and defendant's expert witnesses. (ECF
         No. 335.)
5
6    •    Allstate's motion to strike and objections to the
         declaration of plaintiff's proposed expert Sandy Browne.
         (ECF No. 388.)
7
8    •    Allstate's motion to strike and objections to the
         declaration of plaintiff's proposed expert Reed F.
         Simpson. (ECF No. 350.)
9
10   •    Allstate's motion to strike and objections to the
         declaration of plaintiff's proposed expert James Mathis.
         (ECF No. 351.)
11
12   •    Plaintiff's motion to strike and objections to the
         declaration of Allstate's proposed expert Tony
         Passwater. (ECF No. 362.)
13
14   •    Plaintiff's motion to strike and objections to the
         declaration of Allstate's proposed expert Omar Menifee.
         (ECF No. 363.)
15
16   •    Plaintiff's motion to strike and objections to the
         declaration of Allstate's proposed expert Daniel Davee.
         (ECF No. 370.)
17
18   •    Plaintiff's motion to strike and objections to the
         declaration of Allstate's proposed expert Robert C.
         Lange. (ECF No. 371.)
19
20   •    Allstate's motion to compel appraisal and stay the
         action. (ECF No. 352.)
21   •    Allstate's request to seal certain documents. (ECF
         No. 328.)
22

23       As defendant's motion to compel appraisal would stay this

24   action if granted, it must be considered before turning to

25   plaintiff's motion for class certification.

26   ////

**II. DEFENDANT'S MOTION TO COMPEL APPRAISAL AND STAY THE ACTION**

Plaintiff's insurance contract contains the following appraisal provision:

> Right to Appraisal. Both [the policyholder] and Allstate have a right to demand an appraisal of the loss. Each will appoint and pay a qualified appraiser. Other appraisal expenses will be shared equally. The two appraisers, or a judge of a court of record, will choose an umpire. Each appraiser will state the actual cash value and the amount of loss. If they disagree, they'll submit their differences to the umpire. A written decision by any two of these three persons will determine the amount of the loss. (Policy 21.)

The policy does not explicitly state that appraisal is a precondition to suit, but an accompanying policy endorsement specific to California insureds provides: "Action Against Allstate. No legal action can be brought against us under this coverage unless there is full compliance with all the policy terms." (Id., Policy Endorsement at 8.)

Allstate claims that it invoked the appraisal provision by letter to plaintiff's counsel dated April 30, 2008. (Dec. Martin, Ex. A., ECF No. 336-1.)

As described above, the court previously denied defendant's motion to compel appraisal and stay this action. (Order, March 31, 2009 ("Appraisal Order"), ECF No. 66.) In considering the motion, the court treated the Allstate appraisal provision as an arbitration agreement, and determined that the provision was unconscionable under California law, and therefore, unenforceable under the Federal Arbitration Act. Defendants now contend that reconsideration of this order is called for by the Supreme Court's

1  ruling in <u>AT&T Mobility v. Concepcion</u>, 562 U.S. __, 131 S. Ct. 1740

2  (2011) (holding that the Federal Arbitration Act preempts the

3  California Supreme Court's ruling that class waivers in many

4  consumer arbitration agreements are unconscionable, and therefore,

5  unenforceable).

6       If unconscionability had been the sole ground for denying the

7  motion, there is little doubt that reconsideration would be

8  warranted in light of <u>Concepcion</u>.

9       But the court had another basis to deny Allstate's motion to

10  compel appraisal:

11        A second factor also suggests the stay is inappropriate.
          The appraisal process rests on the possibility that a
12        difference as to cost of repair is at the heart of the
          dispute. Plaintiff's allegations, however, make no such
13        claim. Rather, plaintiff alleges that defendant has a
          policy of never assessing whether repair of the
14        seatbelts is appropriate, and pressuring repair shops so
          that they do not estimate the cost of replacement. It
15        seems clear that both these allegations are outside the
          appraisal provisions, and therefore, would appear to
16        render that provision irrelevant to plaintiff's lawsuit.
          (Appraisal Order at 30.)
17

18  The allegations referred to in this passage appeared in plaintiff's

19  First Amended Complaint, (ECF No. 51), and are reiterated in the

20  operative Second Amended Complaint (ECF No. 67). Accordingly,

21  reconsideration of the previous order denying appraisal is

22  warranted only if, first, plaintiff's motion for class

23  certification is based on allegations different from those in the

24  complaint, and second, an appraisal of the cost of repair is

25  relevant to the new allegations.

26       Plaintiff seeks to certify a class of Allstate insureds

"[w]hose loss involved a collision of sufficient severity to damage the seat belt systems in occupied seating positions" and "[w]hose seat belt systems Allstate did not pay to replace." (Memorandum of Law in Support of Plaintiff's Motion for Class Certification at 3, ECF No. 322) Plaintiff is alleged to be typical of the putative class because he is:

> an Allstate policyholder who claims that his seatbelts were damaged in a major collision; who asserts that Allstate failed to meet its contractual obligation to restore his vehicle to its pre-loss condition by paying to replace the seatbelts; and who asserts that Allstate committed insurance bad faith and fraudulent and unfair business practices by engaging in claims adjusting practices that lead to non-payment for seatbelt replacements. . . . (Id. at 23) (internal citations omitted).

It appears that the class allegations are consistent with the individual allegations in the SAC, and therefore, do not warrant a modification of the court's previous order declining to compel an appraisal.

In reaching this conclusion, the court explicitly disagrees with defendant's repeated contentions that, "At its core, this case challenges the amount that Allstate paid to settle an automobile physical damage claim." (Opposition to Motion for Class Cert. at 23, ECF No. 335; see also Memorandum of Points and Authorities in Support of Motion to Compel Appraisal and Stay Action at 2, ECF No. 352.) This lawsuit challenges Allstate's practices in failing to properly inspect, identify, and repair damaged seatbelts, alleging that these failures constitute breach of contract, insurance bad faith, fraud, and unfair business practices. While

9

1   it likely would have cost Allstate more to inspect and replace

2   plaintiff's seatbelts than otherwise, these additional expenses

3   would have been incurred only if Allstate practices would have

4   found that the seatbelts were damaged. An appraisal would not

5   address the substance of plaintiff's claims.

6       Accordingly, defendant's motion to compel an appraisal and

7   stay the action is denied. The court will next consider the

8   admissibility of the expert declarations.

9   **III. DECLARATION OF SANDY BROWNE**

10       Plaintiff has submitted proposed expert Sandy Browne's

11   declaration in support of its motion for class certification.

12   ("Browne Dec.," ECF No. 331.) Allstate has filed objections and

13   moves to strike portions of the declaration. (ECF No. 388.)

14   Plaintiff has also submitted a reply declaration from Browne

15   ("Browne Reply Dec.," ECF No. 368.) Allstate objects to and moves

16   to strike portions of this declaration as well. (ECF No. 388.)

17       **A. Standard**

18       In determining whether the declaration of a proposed expert

19   is admissible under Federal Rule of Evidence 702,[3] the court must

20   apply the standards developed in Daubert v. Merrell Dow

21   Pharmaceuticals, Inc., 509 U.S. 579 (1993), Kumho Tire Co. v.

22   Carmichael, 526 U.S. 137 (1999), and their progeny. See Wal-Mart

23   Stores, Inc. v. Dukes, 564 U.S. __, 131 S. Ct. 2541, 2553-4 (2011)

24   (expressing doubt that Daubert does not apply to expert testimony

25   _____

26       [3] Hereinafter, the term "FRE" refers to the applicable
Federal Rule of Evidence.

1   at the certification stage of class-action proceedings); see also

2   Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011)

3   ("In its analysis of [defendant's] motions to strike, the district

4   court correctly applied the evidentiary standard set forth in

5   Daubert.").

6        At trial, the Daubert inquiry focuses on whether a jury should

7   be permitted to rely on a proposed expert's testimony in making its

8   findings of fact. In the class certification context, the inquiry

9   addresses whether the court may rely on the expert's testimony in

10  deciding if Federal Rule of Civil Procedure 23's requirements have

11  been met.[4]

12       Supreme Court decisions emphasize the need for courts to

13  conduct a "rigorous analysis" of class certification requirements

14  under FRCP 23. General Telephone Co. of Southwest v. Falcon, 457

15  U.S. 147, 161 (1982); Wal-Mart, 131 S. Ct. at 2551. The Ninth

16  Circuit has recently determined that, to the extent that merits

17  claims overlap with the class certification issues, as part of the

18  consideration of class certification, district courts must consider

19  the merits of class members' substantive claims, rather than

20  deferring such consideration to trial. Ellis, 657 F.3d at 981.

21  Evaluation of the merits may even require the court to decide a

22  "battle of the experts" as to certification issues. Id. at 982.

23  Accordingly, to the extent that an expert's opinion may come into

24  play in deciding whether to certify a class, the court must ensure

25  ————————————

26       [4] Hereinafter, the term "FRCP" refers to the applicable
    Federal Rule of Civil Procedure.

1   that the expert's testimony passes muster under FRE 702 and

2   Daubert.[5]

3       Under FRE 702:

4       A witness who is qualified as an expert by knowledge,
        skill, experience, training, or education may testify in
5       the form of an opinion or otherwise if:

6       (a) the expert's scientific, technical, or other
        specialized knowledge will help the trier of fact to
7       understand the evidence or to determine a fact in issue;

8       (b) the testimony is based on sufficient facts or data;

9       (c) the testimony is the product of reliable principles
        and methods; and

10
        (d) the expert has reliably applied the principles and
11      methods to the facts of the case.

12  The proponent of expert testimony has the burden of establishing

13  that these requirements for admissibility are met by a

14  preponderance of the evidence. Fed. R. Evid. 702, Advisory

15  Committee's Note to the 2000 Amendments. FRE 702 "does not

16  distinguish between scientific and other forms of expert testimony.

17  The trial court's gatekeeping function applies to testimony by any

18  expert." Id. (citing Kumho Tire, 526 U.S. at 141).

19      Under Daubert, the court exercises its gatekeeping function

20  through conducting a two-step assessment: first, it determines

21  _____

22      [5] It is difficult to know what exactly the district court
    should do, since Ellis also provides that "Rule 23 does not
23  authorize a preliminary inquiry into the merits . . . for purposes
    other than determining whether certification was proper. To hold
24  otherwise would turn class certification into a mini-trial." Ellis,
    657 F.3d at 983 n.8 (internal citation omitted). See Ellis v.
25  Costco Wholesale Corp., 285 F.R.D. 492 (N.D.Cal. 2012), in which
    Judge Chen, attempting to comply with the circuit's ruling,
26  perceived it necessary to engage in the very analysis which would
    be applied at trial.

12

whether the proposed expert's testimony is reliable, and second, whether it is relevant. Daubert, 509 U.S. at 592-593. Daubert provides a non-exclusive set of factors for district courts to consider in determining reliability:

> (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;
>
> (2) whether the technique or theory has been subject to peer review and publication;
>
> (3) the known or potential rate of error of the technique or theory when applied;
>
> (4) the existence and maintenance of standards and controls; and
>
> (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R. Evid. 702, Advisory Committee's Note to the 2000 Amendments. Some courts have identified additional factors relevant to the reliability inquiry, such as:

> (1) Whether [the expert is] proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation, or whether [he has] developed [his] opinions expressly for purposes of testifying . . . .
>
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion . . . .
>
> (3) Whether the expert has adequately accounted for obvious alternative explanations . . . .
>
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting . . . . [; and]
>
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of

1    opinion the expert would give . . . .

2  Id. (internal citations and quotations omitted).

3       District courts have great flexibility in choosing which of
4  these factors, if any, to apply in assessing the admissibility of
5  expert testimony. "[T]here are many different kinds of experts, and
6  many different kinds of expertise." Kumho Tire, 526 U.S. at 150.
7  "We can neither rule out, nor rule in, for all cases and for all
8  time the applicability of the factors mentioned in Daubert, nor can
9  we now do so for subsets of cases categorized by category of expert
10 or by kind of evidence. Too much depends upon the particular
11 circumstances of the particular case at issue." Id.

12      Nevertheless, "nothing in either Daubert or the Federal Rules
13 of Evidence requires a district court to admit opinion evidence
14 that is connected to existing data only by the ipse dixit of the
15 expert." General Electric v. Joiner, 522 U.S. 136, 146 (1997). The
16 court may conclude that "there is simply too great an analytical
17 gap between the data and the opinion proffered." Id.

18      Ultimately, district courts have considerable discretion to
19 admit or exclude expert testimony. See id.

20      **B. Analysis**

21           **1. Effect of admitting Browne's previous declaration**

22      Plaintiff begins by arguing that, because Browne's prior
23 declaration was deemed admissible under FRE 702 and Daubert for the
24 purposes of deciding Allstate's motion for summary judgment (Order,
25 March 30, 2012 ("MSJ Order"), ECF No. 290), it follows that her
26 declarations herein must be admissible for the purposes of

14

1  determining class certification. (Plaintiff's Amended Opp. to Mot.
2  to Strike Browne Dec. at 3-8, ECF No. 394.)

3      Allstate counters that Browne's prior testimony was deemed
4  admissible because it was based in part on a fact-specific analysis
5  of the collision in which plaintiff's vehicle was involved, a
6  matter on which she was deemed qualified to opine. By contrast,
7  Allstate argues, Browne's opinions herein go beyond her
8  demonstrated expertise, knowledge, experience, and training.
9  (Allstate's Amended Mot. to Strike Browne Dec. at 2-7, ECF
10 No. 388.)

11     The court's previous Order provided that, "Plaintiff offers
12 Browne's testimony in order to prove that Allstate was
13 contractually obligated to pay for the replacement of the seat
14 belts following the collision because the seat belts were 'deemed
15 damaged' and could not have returned to [their] original
16 condition." (MSJ Order at 15.) The question at issue in the summary
17 judgment motion was whether Allstate had to replace plaintiff
18 Watts's seatbelts following the collision, not whether Allstate
19 must replace seatbelts after all sufficiently-serious collisions
20 (the question presented by the instant motion for class
21 certification). Browne's testimony was only deemed admissible on
22 the first, narrower question. As stated in the Order: "The court
23 now analyzes whether Browne's expert testimony **on this point** is
24 reliable and relevant under the framework set forth in
25 Daubert . . . ." (Id.) The Order further provided: "the Browne
26 testimony [is] reliable and relevant. Ms. Browne's experience and

training in biomechanics and engineering is vast, and her
conclusions are relevant to **a core issue** in this case," namely,
whether Allstate had to replace plaintiff's seatbelts.

The court's ruling on the summary judgment motion relied
heavily on portions of Browne's declaration describing her review
of accident and medical records from the Watts auto collision. (MSJ
Order at 17.) While the court took into account Browne's opinion
that a seatbelt involved in an accident of sufficient severity will
stretch and not return to its original elasticity (id. at 14, 16),
it did so in reaching the conclusion that there was a "triable
issue on the factual question of whether the Watts' seatbelts were
damaged following the collision," (id. at 17), and that summary
judgment in Allstate's favor was therefore inappropriate.

The previous determination of admissibility does not mean that
Browne's present declarations are admissible on the issue of class
certification. The court's admission of Browne's prior declaration
at summary judgment has some bearing on the admissibility of her
subsequent testimony going forward. Nonetheless, the issues
presented by class certification in this case are sufficiently
different from those presented by the summary judgment motion so
as to require a new determination of admissibility.

### 2. Browne's qualifications

Browne's statement of her qualifications (Browne Dec. ¶¶ 1-12)
is virtually identical to that in her previous declaration.
(Declaration of Sandy Browne in Opposition to Defendants' Motion
for Summary Judgment ¶¶ 1-12, ECF No. 232.) The court earlier

16

1  summarized these qualifications as follows:

2      Ms. Browne is a former accident investigator with the
       National Transportation Safety Board and the National
3      Highway Traffic Safety Administration. She has completed
       approximately 2000 hours of training in accident
4      investigation through the University of Southern
       California, Stanford University, the Department of
5      Transportation, and the National Transportation Safety
       Board. That training included course[s] on seat belt
6      systems, and their construction, their performance,
       their testing requirements, their failures, their
7      inefficiencies, and the biomechanical result of lap
       belts. She has published dozens of articles on
8      automobile accidents, including on the performance of
       lap and shoulder belts in car accidents, and has
9      provided numerous trainings on car accidents to the
       California Highway Patrol, including on restraint
10     systems. In the course of her experience as an
       investigator and as a consultant in seat belt safety,
11     Browne has personally inspected dozens of seat belts
       that have been involved in car accidents. (MSJ Order at
12     15-16) (internal citations and quotations omitted).

13     In her reply declaration, Browne adds that, while she received

14 most of her official training between 1970 and 1990 (the period in

15 which seatbelt research was allegedly at its peak), she has since

16 "continuously kept [her]self abreast of the latest developments and

17 research in [the] field." (Browne Reply Dec. ¶ 17, ECF No. 331.)

18     **3. Browne's opinions**

19     Browne offers the following expert opinions in her declaration

20 in support of class certification:

21     1. Allstate's Next Gen and Legacy systems[6] contain

22 _____

23     [6] Next Gen and Legacy are computer systems used by Allstate
   in processing auto insurance claims; as their names suggest, Legacy
24 is the older of the two systems. While there is disagreement among
   the parties' proposed experts as to the nature and reliability of
25 the data captured in these systems, those disputes need not be
   resolved in determining the present issue as to the admissibility
26 of Browne's declaration.

information sufficient to conclude that the Allstate policyholders in the [proposed] class experienced a "collision of sufficient severity to damage the seat belt systems in occupied seating positions," as stated in the class definition . . . . Allstate should have paid to replace all such systems.

2. Allstate engages in a series of uniform practices that are unsound from an engineering standpoint, and that prevent Allstate from detecting or recording its policyholders' seatbelt damage. These practices are: (1) limiting seatbelt inspection and replacement to cases of airbag deployment; (2) adopting a "Write Only What You Can See" process that cannot detect latent damage such as webbing stretch; (3) failing to adopt adequate seatbelt system inspection procedures or to adequately train its personnel to perform such procedures; (4) failing to require adjusters to consult and adhere to vehicle manufacturer recommendations regarding post-collision seatbelt inspection and/or replacement; and (5) failing to include appropriate fields in its claim processing system, Next Gen, to detect and record seatbelt damage. As a result of these practices, in the majority of cases, Allstate has not paid to replace its policyholders' damaged seatbelts.

3. For future claims handling, Allstate should be required to collect and maintain additional data points

18

1  relevant to capturing latent seatbelt damage, detecting
2  and recording discernible seatbelt damage, and replacing
3  Allstate's policyholders' damaged seatbelt systems.
4  (Browne Dec. at 32-33.)

5           **4. Admissibility of Browne's first opinion**

6       Browne makes the following assertions in support of her first
7  opinion, *supra*:

8       1.    Federal   Motor   Vehicle   Safety   Standards   require
9             automobile  seatbelt  systems  in  the  United States  to
10            stretch to a specified extent when subject to specified
11            forces. (Browne Dec. ¶¶ 38 – 43.)

12      2.    "Once stretched, seatbelt webbing never fully returns to
13            its original length." (Browne Dec. ¶ 35.)

14      3.    "Once the webbing is stretched, its capacity to protect
15            the occupant is compromised." (Browne Dec. ¶ 35.)

16      4.    "The    seatbelt    webbing    will    stretch    in    an
17            accident . . . if the seatbelt is loaded with a
18            sufficient degree of force. 'Loaded' is a technical term
19            meaning the occupant's body contacted the restraint
20            system (specifically, the webbing) and applied pressure
21            to the restraint system during speed deceleration."
22            (Browne Dec. ¶ 44.)

23      5.    "Whether the loading caused the webbing to stretch in a
24            given collision depends on two factors: (1) the type of
25            collision, which indicates the principal **direction** of
26            force; and (2) the degree of damage to the vehicle,

19

1   which shows the **amount** of force to which the seatbelt

2   was subjected." (Browne Dec. ¶ 44) (emphasis in

3   original).

4   6.   "For a head-on collision resulting in major damage to

5       the vehicle, I can state with certainty that the

6       seatbelts loaded, that the webbing stretched, and that

7       the seatbelt system is therefore damaged . . . . I can

8       also state with certainty that seatbelt damage occurs in

9       other types of collisions . . . [because] the **direction**

10      of force, combined with the degree of damage (**amount** of

11      force), necessarily results in seatbelt loading and

12      therefore damaged seatbelt webbing. It happens because

13      of the uniform laws of physics controlling all

14      collisions, and because of the uniform properties of all

15      seatbelt webbing . . . ." (Browne Dec. ¶ 47) (emphasis

16      in original).

17  7.   "If one's goal is to restore a vehicle to its pre-

18      accident condition, then the entire seatbelt system must

19      be replaced. It is not possible to repair the webbing,

20      nor is it possible to replace only the webbing in a

21      seatbelt system. Rather, the entire system, including

22      the webbing, must be removed and a new system

23      installed." (Browne Dec. ¶ 36.)

24  8.   "I have carefully reviewed screen shots showing the

25      fields of data collected by [Allstate's Legacy and Next

26      Gen computer systems]." (Browne Dec. ¶ 48.) "Attached

1            [to my declaration are matrices] that I prepared based

2            on my review of screen shots . . . . [These matrices

3            identify] the fields of data that, when pulled from the

4            [Legacy and Next Gen computer systems] by a computer

5            technician, will yield a list of claims involving

6            collisions in which the seat belt systems were damaged."

7            (Browne Dec. ¶ 49, 56.)

8      All of these assertions must pass muster under Rule 702 and

9 Daubert in order for Browne's first opinion to be admissible as

10 expert testimony.

11      Given Ms. Browne's training and experience, I would find that

12 the first seven assertions — that a loaded seatbelt subjected to

13 sufficient force in a particular direction in an auto collision

14 will stretch and not return to its original shape, thereby

15 rendering it unsafe for future use; that head-on collisions causing

16 major damage to vehicles and certain other types of collisions

17 subject loaded seatbelts to the requisite force; and that to

18 restore such seatbelts to safe condition, one must replace the

19 entire seatbelt system, rather than just the webbing — are

20 admissible.

21      This leaves Browne's assertion that, based on a review of

22 screen shots of Allstate's Legacy and Next Gen computer systems,

23 she can identify the "fields of data that . . . will yield a list

24 of claims involving collisions in which the seat belt systems were

25 damaged." (Browne Dec. ¶ 49, 56.) In other words, Browne claims

26 that she can infer from Allstate's computer record of a collision

1    whether the seatbelts were irreparably damaged in that collision.

2    According to Browne, certain fields in Allstate's systems ("Degree

3    of Damage" and "Was a case or report created?" in the Next Gen

4    system; "Was the asset damaged in this loss?," "Calculated Degree

5    of  Damage,"  and  "Was  a  report  filed?"  in  the  Legacy  system)

6    indicate the amount of force, while other fields ("Loss Type" and

7    "Detailed Loss Type" in the Next Gen system; "Loss Facts/Auto,"

8    "Insured Vehicle Action," and "Insured Vehicle Road Type" in the

9    Legacy  system)  indicate  the  direction  of  force.[7]  (Browne  Dec.

10   ¶¶ 51, 52, 58.)

11        Browne's  assertion  that  she  can  identify  vehicles  whose

12   seatbelts ought to have been replaced from the information in

13   Allstate's  computer  systems  is  critical  to  the  certification

14   inquiry. Plaintiff seeks to certify a class of individuals, among

15   other  things,  "whose  loss  involved  a  collision  of  sufficient

16   severity  to  damage  the  seat  belt  systems  in  occupied  seating

17   positions." The only means plaintiff offers to ascertain these

18   individuals' identities is by selecting the appropriate fields in

19   Allstate's  computer  systems.  Browne's  opinion  is  critical  to

20   establishing that the class members' seatbelt systems were damaged

21   in the identified collisions, because absent her opinion, there is

22   no way to correlate Allstate's claims data with the extent of

23

24        [7] Each of these fields record descriptive categories of
     information, such as "Minor," "Moderate, "Major," and "Possible
25   Total Loss" in the "Degree of Damage" field or "Changing lanes,"
     "Head-on collision," "Insured hit a fixed object," etc. in the
26   "Detailed Loss Type" field. (See Browne Dec. Exs. B, C.)

1  damage to the vehicles.

2  FRE 702(c) requires that, to be admissible, expert testimony

3  must be "the product of reliable principles and methods." But both

4  of Browne's declarations in support of this motion lack any

5  description of the principles or methods she uses to deduce the

6  degree of damage to seatbelt webbing from the fields in Allstate's

7  computer systems. There is simply no presentation of her

8  methodology at all.

9  In her initial declaration, Browne claims that she is able to

10  identify the affected Allstate policyholders having "carefully

11  reviewed screen shots showing the fields of data collected by each

12  system." (Browne Dec. ¶ 48.) She later adds that she has reviewed

13  the declaration of Omar Menifee, a defense witness, which "confirms

14  that [her] reliance on the 'Degree of Damage' field is

15  appropriate." (Browne Dec. ¶ 55.)

16  In her reply declaration, Browne justifies her interpretation

17  of the data in the Allstate systems by citing her professional

18  opinion, *e.g.*, "I have selected the fields and menu options that,

19  in my professional opinion, demonstrate that the principal

20  **direction** of force and the **amount** of force involved in the

21  collision resulted in seatbelt loading and webbing stretch" (Browne

22  Dec. ¶ 58) (emphasis in original). In her reply declaration, Browne

23  adds:

24      [M]y selection of the data fields for my matrices is
        based on the thousands of real-world collisions that I
25      have examined and evaluated in my career. I am an expert
        in accident reconstruction. I have performed thousands
26      of accident reconstructions. It is precisely because of

23

1     my extensive experience as an accident reconstructionist
      that I can testify that that information on the type of
2     incident in which the vehicle was involved, and
      information on the type of damage the incident caused to
3     the vehicle, are highly relevant facts from which I can
      draw conclusions sufficient to reconstruct the general
4     principal direction and approximate degree of the forces
      involved. Allstate's databases contain facts sufficient
5     for this purpose in its "Degree of Damage," "Calculated
      Degree of Damage," "Loss Facts," "Insured Vehicle
6     Action," "Insured Vehicle Road Type," "Was a case or
      report created," "Loss Type," and "Detailed Loss Type"
7     data fields. (Browne Reply Dec. ¶ 86.)

8  Later, she states, "The fields of data I have selected from

9  Allstate's Legacy and NextGen systems contain reliable information

10 of the kind routinely relied on by accident reconstructionists who

11 are trying to piece together an accident after the fact." (Browne

12 Reply Dec. ¶ 87.)

13     But beyond these conclusory assertions, Browne simply fails

14 to explain how she derives her conclusions about which collisions

15 led to unsafe seatbelt stretching from the fields in Allstate's

16 systems. An expert is not forbidden from relying on her experience.

17 But "[i]f the witness is relying solely or primarily on experience,

18 then the witness must explain how that experience leads to the

19 conclusion reached, why that experience is a sufficient basis for

20 the opinion, and how that experience is reliably related to the

21 facts." Fed. R. Evid. 702, Advisory Committee's Note to the 2000

22 Amendments. Browne's declarations fail to meet this standard. While

23 it may be true, as Brown avers, that by experience she can

24 determine that the fields reflect particular types of real-world

25 accidents, she does not take the next, necessary step of relating

26 that conclusion to degrees of damage to seatbelt systems.

1    Moreover, none of the factors identified by <u>Daubert</u> and <u>Kumho</u>
2    <u>Tire</u> as indicia of reliability for expert testimony are present in
3    Browne's testimony. There is nothing to indicate that Browne's
4    methodology "can be (and has been) tested." <u>Daubert</u>, 509 U.S. at
5    593. Browne does not indicate that she has examined Allstate-
6    insured vehicles involved in collisions and attempted to correlate
7    the degree of seatbelt stretching to the fields in Allstate's
8    database. Granting that it would have been difficult to obtain
9    sample vehicles for such a study in discovery (*e.g.*, for reasons
10   of consumer privacy), Browne does assert that "the type of incident
11   in which the vehicle was involved, and information on the type of
12   damage the incident caused to the vehicle, are highly relevant
13   facts from which I can draw conclusions sufficient to reconstruct
14   the general principal direction and approximate degree of the
15   forces involved." (Browne Reply Dec. ¶ 86.) In other words, she is
16   arguing that generic information about "the type of incident in
17   which the vehicle was involved" and "the type of damage the
18   incident caused to the vehicle" is sufficient to determine seatbelt
19   stretching. This suggests that she should be able to conduct real-
20   world tests of accidents to see whether her categories of "type of
21   incident" and "type of damage" correlate with seatbelt damage. But
22   not only does she fail to describe testing of her methodology by
23   herself or others, she does not even describe her methodology.

24   Browne similarly neglects to mention whether her methodology
25   "has been subjected to peer review and publication." <u>Id.</u>, 509 U.S.
26   at 593. While publication "does not necessarily correlate with

1  reliability" and is "not [a] dispositive consideration in assessing
2  the scientific validity of a . . . methodology," id. at 593-4, the
3  absence of such citation suggests that Browne's methodology is
4  personal, rather than generally-accepted. This absence is
5  particularly striking given her statement that "[t]he fields of
6  data [she has] selected from Allstate's Legacy and NextGen systems
7  contain reliable information of the kind routinely relied on by
8  accident reconstructionists who are trying to piece together an
9  accident after the fact." (Browne Reply Dec. ¶ 87.) There is
10 nothing, however, describing these routine techniques and their
11 reliability, and then relating them to seatbelt damage. Similarly,
12 Browne fails to cite any "standards controlling [her methodology's]
13 operation," id. at 594, among the accident reconstruction
14 community.

15      Finally, there is no description of the "known or potential
16 rate of error" in Browne's methodology. Id. at 594. As the Supreme
17 Court has noted, when considering "experience-based testimony[, i]n
18 certain cases, it will be appropriate for the trial judge to ask,
19 for example, how often an engineering expert's experience-based
20 methodology has produced erroneous results . . . ." Kumho Tire, 526
21 U.S. at 151. There is no requirement that Browne's methodology must
22 be infallible in order to pass muster for reliability under Rule
23 702. But it is difficult to assess her methodology's reliability
24 without some sense of the number of false positives, if any, it is
25 likely to include.

26      Ultimately, Browne is asking the court to make an inferential

26

1    leap from the data in Allstate's computer systems to the alleged

2    degree of damage to seatbelt systems based solely on her

3    experience, without any explanation of her methods or justification

4    for their reliability. Accordingly, the court is left to conclude

5    that "there is simply too great an analytical gap between the data

6    and the opinion proffered" by Browne to allow its admission.

7    Joiner, 522 U.S. at 146. Or as the Ninth Circuit put it, "We've

8    been presented with only the experts' qualifications, their

9    conclusions and their assurances of reliability. Under Daubert,

10   that's not enough." Daubert v. Merrell Dow Pharmaceuticals, Inc.,

11   43 F.3d 1311, 1319 (9th Cir. 1995) ("Daubert II").[8]

12       In sum, Browne has failed to provide any basis for determining

13   that the methodology she uses to identify collisions that require

14   seatbelt replacement, based on the data in Allstate's computer

15   systems, is reliable. Therefore, the opinion she advances that is

16   based on this methodology - that "Allstate's Next Gen and Legacy

17   systems contain information sufficient to conclude that the

18   Allstate policyholders in the class experienced a 'collision of

19   sufficient severity to damage the seat belt systems in occupied

20   seating positions'" (Browne Dec. ¶ 95) - is also inadmissible for

21   purposes of deciding the motion for class certification. As this

22   opinion is the basis of the class that plaintiff seeks to certify,

23

24       [8] The court wishes to be clear.  It may be that some or indeed
     many of the cars identified by the plaintiff have had seat belt
25   impairment.  The problem is, given the expert's reticence, it is
     impossible to identify which cars may have been subject to that
26   loss, and which cars may have been free of that loss.

1  it follows that the court must deny the motion for class

2  certification.

3      Given the court's disposition of the motion, the court need

4  not further examine Browne's conduct relative to a failure to cite

5  the article from which she took about ten (10) paragraphs of her

6  declaration, making it appear that she was the author of the

7  material.  It suffices to say such conduct is unacceptable.

8  **IV. CONCLUSION**

9      Accordingly, the court hereby orders as follows:

10     [1] Defendant's motion to compel appraisal and stay this

11     action is DENIED.

12     [2] Defendant's objection under Federal Rule of Evidence 702

13     to the admissibility of the declaration of Sandy Browne is

14     SUSTAINED.

15     [3] Plaintiff's motion for class certification is DENIED

16     without prejudice.

17     [4] Defendant's request for an evidentiary hearing is DENIED

18     as moot.

19     [5] Defendant's motions to strike and objections to the

20     declarations of plaintiff's proposed experts Reed F. Simpson

21     and James Mathis are DENIED as moot.

22     [6] Plaintiff's motions to strike and objections to the

23     declarations of defendant's proposed experts Tony Passwater,

24     Omar Menifee, Daniel Davee, and Robert C. Lange are DENIED as

25     moot.

26     [7] Allstate's request to seal documents stands SUBMITTED,

1    and an appropriate order will issue.

2    IT IS SO ORDERED.

3    DATED:  January 16, 2013.

4

5

6                              _____
                               LAWRENCE K. KARLTON
7                              SENIOR JUDGE
                               UNITED STATES DISTRICT COURT
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26