1

2

3

4

5

6

7                     UNITED STATES DISTRICT COURT

8                FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   ROBERT WATTS, on behalf
     of himself individually and
11   all others similarly situated,

12                                     NO. CIV. S-08-1877 LKK/GGH
               Plaintiff,
13
          v.
14                                            O R D E R
     ALLSTATE INDEMNITY CO.,
15   an Illinois corporation, et al.,

16             Defendants.

17   _____/

18        Plaintiff Robert Watts brings this putative class action

19   against defendants Allstate Indemnity Company, Allstate Insurance

20   Company, and Allstate Property and Casualty Insurance Company

21   (collectively, "Allstate" or "defendant"), alleging (i) breach of

22   contract; (ii) insurance bad faith; (iii) breach of the implied

23   covenant of good faith and fair dealing;[1] (iv) fraud/

24   _____

25        [1] As the court has previously recognized, "the second and
     third causes of action are duplicative of one another." (Order, May
26   11, 2011, 18:7-8, ECF No. 255.)

                              1

misrepresentation; and (v) unfair competition under Cal. Bus. & Prof. Code sec. 17200.[2]

Plaintiff's claims arise from defendant's alleged misconduct in failing to adequately inspect and pay for the replacement of seatbelts damaged in collisions involving insured automobiles. Plaintiff now moves for class certification. Defendant moves to compel appraisal and stay this action.

The motion came on for hearing on January 14, 2013. Having considered the matter, for the reasons set forth below, the court will (i) deny defendant's motion to compel appraisal and stay the action, and (ii) deny plaintiff's motion for class certification.

I. BACKGROUND

A. Factual Background

The following facts are taken from plaintiff Watts's declaration in support of class certification (Declaration of Robert Watts in Support of Plaintiff's Motion for Class Certification ("Watts Dec."), ECF No. 314) and his deposition transcript (Deposition of Robert Watts ("Watts Dep."), Appendix to Defendant's Motion for Summary Judgment Ex. B, ECF No. 202-2).

In 2006, plaintiff Watts was covered by an auto insurance policy purchased from Allstate. (Watts Dec. ¶ 2.) The policy provided that "Allstate will pay for direct and accidental loss to [plaintiff's] insured auto . . . from a collision . . . ." (Allstate Auto Insurance Policy ("Policy") 18, Watts Dec. Ex. A,

---

[2] The court previously dismissed plaintiff's sixth cause of action for RICO violations. (Order, March 31, 2009, ECF No. 66.)

1  ECF No. 314-1.) In the event of loss, Allstate could choose to "pay
2  for the loss in money, or [to] repair or replace the damaged or
3  stolen property." (Policy 21.)

4         On March 29, 2006, plaintiff's 2005 Honda Civic sustained
5  significant damage in a collision. (Watts Dec. ¶ 5.) Plaintiff's
6  wife was driving the Honda, and was accompanied by a passenger.
7  (Id.) Plaintiff had the vehicle towed to Artistic Collision, an
8  auto repair shop of his own choosing. (Watts Dec. ¶ 6; Watts Dep.
9  40:14-41:5.) Artistic Collision prepared a "visible damage quote"
10 which did not include any amount for inspection, repair, or
11 replacement of the seatbelts. (Watts Dec. ¶ 6; Watts Dep. Ex. 3.)
12 On March 31, 2006, an Allstate adjuster reviewed the visible damage
13 quote and authorized repairs at the cost of $6,534.77. (Watts Dec.
14 ¶ 7.) Allstate's estimate did not include any amount for
15 inspection, repair, or replacement of the seatbelts. (Id.) Artistic
16 Collision repaired the car in accordance with the estimate; the
17 final invoice did not include the cost of inspection, repair, or
18 replacement of the seatbelts. (Watts Dec. ¶ 8.) The bill for these
19 services was paid by Allstate. (Id.)

20        At some point between the date of the accident and September
21 2007, plaintiff reviewed the owner's manual for his Honda Civic.
22 (Watts Dep. 75:10-13, 83:1-8.) It provided that seatbelts should
23 be replaced in all vehicles involved in serious collisions. (Watts
24 Dep. 83:6-8.) Plaintiff wrote to Allstate requesting, among other
25 things, that the seatbelt tensioners be replaced in the Honda.
26 (Watts Dec. ¶ 10.) In its response, Allstate refused to cover the

1  replacement of the seat belts and seat belt tensioners, and
2  directed plaintiff to file a complaint with the California Bureau
3  of Automotive Repairs if he still had concerns. (Watts Dec. ¶ 11.)

4       In May 2008, after commencing this action, plaintiff had his
5  seatbelts replaced by Elk Grove Honda at a cost of $1029. (Watts
6  Dec. ¶ 12.)

7       **B. Procedural Background**

8       Plaintiff filed an initial complaint on February 29, 2008, and
9  an amended complaint on November 24, 2008. On November 7, 2008,
10 defendant filed a motion to dismiss and a motion to compel
11 appraisal. (ECF No. 53). The court granted the motion to dismiss
12 in part, and denied the motion to compel appraisal (ECF No. 66).
13 On April 20, 2009, plaintiff filed his Second Amended Complaint
14 ("SAC," ECF No. 67), which is the operative complaint in this
15 action.

16      On April 8, 2011, defendant filed a motion for summary
17 judgment. (ECF No. 201.) The court initially granted the motion in
18 its entirety. (ECF No. 255.) Plaintiff then filed a motion for
19 reconsideration, claiming excusable neglect for failing to cite to
20 the declaration of expert witness Sandy Browne, and arguing that
21 the contents of this declaration created a genuine issue of
22 material fact. (ECF Nos. 260, 266.) On March 30, 2012, the court
23 granted plaintiff partial relief from summary judgment, while
24 leaving unaltered the portion of its previous order holding that
25 the "insurance policy did not [in terms] require Allstate to
26 replace plaintiff's undamaged seatbelts following the collision."

4

(ECF No. 290.)

On May 4, 2012, defendant moved to strike the class allegations in the SAC. (ECF No. 297.) The court vacated the hearing on this motion, and instead ordered plaintiff to bring a motion for class certification according to a briefing schedule set by the court. (ECF Nos. 303, 308.)

Now pending before the court is plaintiff's motion to certify a class of all persons:

(1) Who were issued, in California, by Allstate, an automobile insurance policy that included insurance coverage;

(2) Who made a claim to Allstate for benefits under the policy as a result of a loss to their covered vehicle;

(3) Whose policy was in full force and effect at the time of the loss;

(4) Whose loss occurred from February 24, 2004 through the present;

(5) Whose loss involved a collision of sufficient severity to damage the seat belt systems in occupied seating positions; and

(6) Whose seat belt systems Allstate did not pay to replace. (Plaintiff's Motion for Class Certification, ECF No. 322.)

If certified, the class may include up to several hundred thousand individuals, as, according to plaintiff's counsel Wendy York, 867,026 California policyholders submitted auto collision repair claims to Allstate in the 2004 - 2009 period, of which only 1.2% resulted in the replacement or repair of seatbelts or seatbelt components. (Declaration of Wendy C. York in Support of Plaintiff's Motion for Class Certification ¶¶ 29-31, ECF No. 332.) Allstate

1  opposes class certification. (ECF No. 335.)

2      The following motions are also pending before the court:

3      •   Allstate's request for an evidentiary hearing on factual
           disputes relating to class certification between
4          plaintiff's and defendant's expert witnesses. (ECF
           No. 335.)
5
6      •   Allstate's motion to strike and objections to the
           declaration of plaintiff's proposed expert Sandy Browne.
           (ECF No. 388.)
7
8      •   Allstate's motion to strike and objections to the
           declaration of plaintiff's proposed expert Reed F.
           Simpson. (ECF No. 350.)
9
10     •   Allstate's motion to strike and objections to the
           declaration of plaintiff's proposed expert James Mathis.
           (ECF No. 351.)
11
12     •   Plaintiff's motion to strike and objections to the
           declaration of Allstate's proposed expert Tony
           Passwater. (ECF No. 362.)
13
14     •   Plaintiff's motion to strike and objections to the
           declaration of Allstate's proposed expert Omar Menifee.
           (ECF No. 363.)
15
16     •   Plaintiff's motion to strike and objections to the
           declaration of Allstate's proposed expert Daniel Davee.
           (ECF No. 370.)
17
18     •   Plaintiff's motion to strike and objections to the
           declaration of Allstate's proposed expert Robert C.
           Lange. (ECF No. 371.)
19
20     •   Allstate's motion to compel appraisal and stay the
           action. (ECF No. 352.)
21     •   Allstate's request to seal certain documents. (ECF
           No. 328.)
22

23     As defendant's motion to compel appraisal would stay this

24  action if granted, it must be considered before turning to

25  plaintiff's motion for class certification.

26  ////

1   **II. DEFENDANT'S MOTION TO COMPEL APPRAISAL AND STAY THE ACTION**

2       Plaintiff's insurance contract contains the following

3   appraisal provision:

> Right to Appraisal. Both [the policyholder] and Allstate
> have a right to demand an appraisal of the loss. Each
> will appoint and pay a qualified appraiser. Other
> appraisal expenses will be shared equally. The two
> appraisers, or a judge of a court of record, will choose
> an umpire. Each appraiser will state the actual cash
> value and the amount of loss. If they disagree, they'll
> submit their differences to the umpire. A written
> decision by any two of these three persons will
> determine the amount of the loss. (Policy 21.)

10  The policy does not explicitly state that appraisal is a

11  precondition to suit, but an accompanying policy endorsement

12  specific to California insureds provides: "Action Against Allstate.

13  No legal action can be brought against us under this coverage

14  unless there is full compliance with all the policy terms." (Id.,

15  Policy Endorsement at 8.)

16      Allstate claims that it invoked the appraisal provision by

17  letter to plaintiff's counsel dated April 30, 2008. (Dec. Martin,

18  Ex. A., ECF No. 336-1.)

19      As described above, the court previously denied defendant's

20  motion to compel appraisal and stay this action. (Order, March 31,

21  2009 ("Appraisal Order"), ECF No. 66.) In considering the motion,

22  the court treated the Allstate appraisal provision as an

23  arbitration agreement, and determined that the provision was

24  unconscionable under California law, and therefore, unenforceable

25  under the Federal Arbitration Act. Defendants now contend that

26  reconsideration of this order is called for by the Supreme Court's

1    ruling in <u>AT&T Mobility v. Concepcion</u>, 562 U.S. __, 131 S. Ct. 1740
2    (2011) (holding that the Federal Arbitration Act preempts the
3    California Supreme Court's ruling that class waivers in many
4    consumer arbitration agreements are unconscionable, and therefore,
5    unenforceable).

6         If unconscionability had been the sole ground for denying the
7    motion, there is little doubt that reconsideration would be
8    warranted in light of <u>Concepcion</u>.

9         But the court had another basis to deny Allstate's motion to
10   compel appraisal:

11        A second factor also suggests the stay is inappropriate.
          The appraisal process rests on the possibility that a
12        difference as to cost of repair is at the heart of the
          dispute. Plaintiff's allegations, however, make no such
13        claim. Rather, plaintiff alleges that defendant has a
          policy of never assessing whether repair of the
14        seatbelts is appropriate, and pressuring repair shops so
          that they do not estimate the cost of replacement. It
15        seems clear that both these allegations are outside the
          appraisal provisions, and therefore, would appear to
16        render that provision irrelevant to plaintiff's lawsuit.
          (Appraisal Order at 30.)
17

18   The allegations referred to in this passage appeared in plaintiff's
19   First Amended Complaint, (ECF No. 51), and are reiterated in the
20   operative Second Amended Complaint (ECF No. 67). Accordingly,
21   reconsideration of the previous order denying appraisal is
22   warranted only if, first, plaintiff's motion for class
23   certification is based on allegations different from those in the
24   complaint, and second, an appraisal of the cost of repair is
25   relevant to the new allegations.

26        Plaintiff seeks to certify a class of Allstate insureds

"[w]hose loss involved a collision of sufficient severity to damage

the seat belt systems in occupied seating positions" and "[w]hose

seat belt systems Allstate did not pay to replace." (Memorandum of

Law in Support of Plaintiff's Motion for Class Certification at 3,

ECF No. 322) Plaintiff is alleged to be typical of the putative

class because he is:

> an Allstate policyholder who claims that his seatbelts
> were damaged in a major collision; who asserts that
> Allstate failed to meet its contractual obligation to
> restore his vehicle to its pre-loss condition by paying
> to replace the seatbelts; and who asserts that Allstate
> committed insurance bad faith and fraudulent and unfair
> business practices by engaging in claims adjusting
> practices that lead to non-payment for seatbelt
> replacements. . . . (Id. at 23) (internal citations
> omitted).

It appears that the class allegations are consistent with the

individual allegations in the SAC, and therefore, do not warrant

a modification of the court's previous order declining to compel

an appraisal.

In reaching this conclusion, the court explicitly disagrees

with defendant's repeated contentions that, "At its core, this case

challenges the amount that Allstate paid to settle an automobile

physical damage claim." (Opposition to Motion for Class Cert. at

23, ECF No. 335; see also Memorandum of Points and Authorities in

Support of Motion to Compel Appraisal and Stay Action at 2, ECF

No. 352.) This lawsuit challenges Allstate's practices in failing

to properly inspect, identify, and repair damaged seatbelts,

alleging that these failures constitute breach of contract,

insurance bad faith, fraud, and unfair business practices. While

9

1   it likely would have cost Allstate more to inspect and replace

2   plaintiff's seatbelts than otherwise, these additional expenses

3   would have been incurred only if Allstate practices would have

4   found that the seatbelts were damaged. An appraisal would not

5   address the substance of plaintiff's claims.

6        Accordingly, defendant's motion to compel an appraisal and

7   stay the action is denied. The court will next consider the

8   admissibility of the expert declarations.

9   **III. DECLARATION OF SANDY BROWNE**

10       Plaintiff has submitted proposed expert Sandy Browne's

11  declaration in support of its motion for class certification.

12  ("Browne Dec.," ECF No. 331.) Allstate has filed objections and

13  moves to strike portions of the declaration. (ECF No. 388.)

14  Plaintiff has also submitted a reply declaration from Browne

15  ("Browne Reply Dec.," ECF No. 368.) Allstate objects to and moves

16  to strike portions of this declaration as well. (ECF No. 388.)

17       **A. Standard**

18       In determining whether the declaration of a proposed expert

19  is admissible under Federal Rule of Evidence 702,[3] the court must

20  apply the standards developed in Daubert v. Merrell Dow

21  Pharmaceuticals, Inc., 509 U.S. 579 (1993), Kumho Tire Co. v.

22  Carmichael, 526 U.S. 137 (1999), and their progeny. See Wal-Mart

23  Stores, Inc. v. Dukes, 564 U.S. __, 131 S. Ct. 2541, 2553-4 (2011)

24  (expressing doubt that Daubert does not apply to expert testimony

25  _____

26       [3] Hereinafter, the term "FRE" refers to the applicable
    Federal Rule of Evidence.

1    at the certification stage of class-action proceedings); see also

2    Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011)

3    ("In its analysis of [defendant's] motions to strike, the district

4    court correctly applied the evidentiary standard set forth in

5    Daubert.").

6         At trial, the Daubert inquiry focuses on whether a jury should

7    be permitted to rely on a proposed expert's testimony in making its

8    findings of fact. In the class certification context, the inquiry

9    addresses whether the court may rely on the expert's testimony in

10   deciding if Federal Rule of Civil Procedure 23's requirements have

11   been met.[4]

12        Supreme Court decisions emphasize the need for courts to

13   conduct a "rigorous analysis" of class certification requirements

14   under FRCP 23. General Telephone Co. of Southwest v. Falcon, 457

15   U.S. 147, 161 (1982); Wal-Mart, 131 S. Ct. at 2551. The Ninth

16   Circuit has recently determined that, to the extent that merits

17   claims overlap with the class certification issues, as part of the

18   consideration of class certification, district courts must consider

19   the merits of class members' substantive claims, rather than

20   deferring such consideration to trial. Ellis, 657 F.3d at 981.

21   Evaluation of the merits may even require the court to decide a

22   "battle of the experts" as to certification issues. Id. at 982.

23   Accordingly, to the extent that an expert's opinion may come into

24   play in deciding whether to certify a class, the court must ensure

25   ───────────

26        [4] Hereinafter, the term "FRCP" refers to the applicable
     Federal Rule of Civil Procedure.

1  that the expert's testimony passes muster under FRE 702 and

2  <u>Daubert</u>.[5]

3     Under FRE 702:

4     A witness who is qualified as an expert by knowledge,
      skill, experience, training, or education may testify in
5     the form of an opinion or otherwise if:

6     (a) the expert's scientific, technical, or other
      specialized knowledge will help the trier of fact to
7     understand the evidence or to determine a fact in issue;

8     (b) the testimony is based on sufficient facts or data;

9     (c) the testimony is the product of reliable principles
      and methods; and

10

11    (d) the expert has reliably applied the principles and
      methods to the facts of the case.

12  The proponent of expert testimony has the burden of establishing

13  that these requirements for admissibility are met by a

14  preponderance of the evidence. Fed. R. Evid. 702, Advisory

15  Committee's Note to the 2000 Amendments. FRE 702 "does not

16  distinguish between scientific and other forms of expert testimony.

17  The trial court's gatekeeping function applies to testimony by any

18  expert." <u>Id.</u> (citing <u>Kumho Tire</u>, 526 U.S. at 141).

19     Under <u>Daubert</u>, the court exercises its gatekeeping function

20  through conducting a two-step assessment: first, it determines

21  ─────────────────────────────

22     [5] It is difficult to know what exactly the district court
    should do, since <u>Ellis</u> also provides that "Rule 23 does not
23  authorize a preliminary inquiry into the merits . . . for purposes
    other than determining whether certification was proper. To hold
24  otherwise would turn class certification into a mini-trial." <u>Ellis</u>,
    657 F.3d at 983 n.8 (internal citation omitted). <u>See Ellis v.</u>
25  <u>Costco Wholesale Corp.</u>, 285 F.R.D. 492 (N.D.Cal. 2012), in which
    Judge Chen, attempting to comply with the circuit's ruling,
26  perceived it necessary to engage in the very analysis which would
    be applied at trial.

whether the proposed expert's testimony is reliable, and second, whether it is relevant. Daubert, 509 U.S. at 592-593. Daubert provides a non-exclusive set of factors for district courts to consider in determining reliability:

> (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;
>
> (2) whether the technique or theory has been subject to peer review and publication;
>
> (3) the known or potential rate of error of the technique or theory when applied;
>
> (4) the existence and maintenance of standards and controls; and
>
> (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R. Evid. 702, Advisory Committee's Note to the 2000 Amendments. Some courts have identified additional factors relevant to the reliability inquiry, such as:

> (1) Whether [the expert is] proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation, or whether [he has] developed [his] opinions expressly for purposes of testifying . . . .
>
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion . . . .
>
> (3) Whether the expert has adequately accounted for obvious alternative explanations . . . .
>
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting . . . . [; and]
>
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of

1    opinion the expert would give . . . .

2    <u>Id.</u> (internal citations and quotations omitted).

3         District courts have great flexibility in choosing which of

4    these factors, if any, to apply in assessing the admissibility of

5    expert testimony. "[T]here are many different kinds of experts, and

6    many different kinds of expertise." <u>Kumho Tire</u>, 526 U.S. at 150.

7    "We can neither rule out, nor rule in, for all cases and for all

8    time the applicability of the factors mentioned in <u>Daubert</u>, nor can

9    we now do so for subsets of cases categorized by category of expert

10   or by kind of evidence. Too much depends upon the particular

11   circumstances of the particular case at issue." <u>Id.</u>

12        Nevertheless, "nothing in either <u>Daubert</u> or the Federal Rules

13   of Evidence requires a district court to admit opinion evidence

14   that is connected to existing data only by the *ipse dixit* of the

15   expert." <u>General Electric v. Joiner</u>, 522 U.S. 136, 146 (1997). The

16   court may conclude that "there is simply too great an analytical

17   gap between the data and the opinion proffered." <u>Id.</u>

18        Ultimately, district courts have considerable discretion to

19   admit or exclude expert testimony. <u>See id.</u>

20   **B. Analysis**

21        **1. Effect of admitting Browne's previous declaration**

22        Plaintiff begins by arguing that, because Browne's prior

23   declaration was deemed admissible under FRE 702 and <u>Daubert</u> for the

24   purposes of deciding Allstate's motion for summary judgment (Order,

25   March 30, 2012 ("MSJ Order"), ECF No. 290), it follows that her

26   declarations herein must be admissible for the purposes of

14

1   determining class certification. (Plaintiff's Amended Opp. to Mot.

2   to Strike Browne Dec. at 3-8, ECF No. 394.)

3      Allstate counters that Browne's prior testimony was deemed

4   admissible because it was based in part on a fact-specific analysis

5   of the collision in which plaintiff's vehicle was involved, a

6   matter on which she was deemed qualified to opine. By contrast,

7   Allstate argues, Browne's opinions herein go beyond her

8   demonstrated expertise, knowledge, experience, and training.

9   (Allstate's Amended Mot. to Strike Browne Dec. at 2-7, ECF

10  No. 388.)

11     The court's previous Order provided that, "Plaintiff offers

12  Browne's testimony in order to prove that Allstate was

13  contractually obligated to pay for the replacement of the seat

14  belts following the collision because the seat belts were 'deemed

15  damaged' and could not have returned to [their] original

16  condition." (MSJ Order at 15.) The question at issue in the summary

17  judgment motion was whether Allstate had to replace plaintiff

18  Watts's seatbelts following the collision, not whether Allstate

19  must replace seatbelts after all sufficiently-serious collisions

20  (the question presented by the instant motion for class

21  certification). Browne's testimony was only deemed admissible on

22  the first, narrower question. As stated in the Order: "The court

23  now analyzes whether Browne's expert testimony **on this point** is

24  reliable and relevant under the framework set forth in

25  Daubert . . . ." (Id.) The Order further provided: "the Browne

26  testimony [is] reliable and relevant. Ms. Browne's experience and

1  training in biomechanics and engineering is vast, and her

2  conclusions are relevant to **a core issue** in this case," namely,

3  whether Allstate had to replace plaintiff's seatbelts.

4      The court's ruling on the summary judgment motion relied

5  heavily on portions of Browne's declaration describing her review

6  of accident and medical records from the Watts auto collision. (MSJ

7  Order at 17.) While the court took into account Browne's opinion

8  that a seatbelt involved in an accident of sufficient severity will

9  stretch and not return to its original elasticity (id. at 14, 16),

10  it did so in reaching the conclusion that there was a "triable

11  issue on the factual question of whether the Watts' seatbelts were

12  damaged following the collision," (id. at 17), and that summary

13  judgment in Allstate's favor was therefore inappropriate.

14      The previous determination of admissibility does not mean that

15  Browne's present declarations are admissible on the issue of class

16  certification. The court's admission of Browne's prior declaration

17  at summary judgment has some bearing on the admissibility of her

18  subsequent testimony going forward. Nonetheless, the issues

19  presented by class certification in this case are sufficiently

20  different from those presented by the summary judgment motion so

21  as to require a new determination of admissibility.

22      **2. Browne's qualifications**

23      Browne's statement of her qualifications (Browne Dec. ¶¶ 1-12)

24  is virtually identical to that in her previous declaration.

25  (Declaration of Sandy Browne in Opposition to Defendants' Motion

26  for Summary Judgment ¶¶ 1-12, ECF No. 232.) The court earlier

1  summarized these qualifications as follows:

> Ms. Browne is a former accident investigator with the
> National Transportation Safety Board and the National
> Highway Traffic Safety Administration. She has completed
> approximately 2000 hours of training in accident
> investigation through the University of Southern
> California, Stanford University, the Department of
> Transportation, and the National Transportation Safety
> Board. That training included course[s] on seat belt
> systems, and their construction, their performance,
> their testing requirements, their failures, their
> inefficiencies, and the biomechanical result of lap
> belts. She has published dozens of articles on
> automobile accidents, including on the performance of
> lap and shoulder belts in car accidents, and has
> provided numerous trainings on car accidents to the
> California Highway Patrol, including on restraint
> systems. In the course of her experience as an
> investigator and as a consultant in seat belt safety,
> Browne has personally inspected dozens of seat belts
> that have been involved in car accidents. (MSJ Order at
> 15-16) (internal citations and quotations omitted).

13  In her reply declaration, Browne adds that, while she received

14  most of her official training between 1970 and 1990 (the period in

15  which seatbelt research was allegedly at its peak), she has since

16  "continuously kept [her]self abreast of the latest developments and

17  research in [the] field." (Browne Reply Dec. ¶ 17, ECF No. 331.)

18  **3. Browne's opinions**

19  Browne offers the following expert opinions in her declaration

20  in support of class certification:

21  1. Allstate's Next Gen and Legacy systems[6] contain

22

23  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[6] Next Gen and Legacy are computer systems used by Allstate
in processing auto insurance claims; as their names suggest, Legacy
24  is the older of the two systems. While there is disagreement among
the parties' proposed experts as to the nature and reliability of
25  the data captured in these systems, those disputes need not be
resolved in determining the present issue as to the admissibility
26  of Browne's declaration.

information sufficient to conclude that the Allstate policyholders in the [proposed] class experienced a "collision of sufficient severity to damage the seat belt systems in occupied seating positions," as stated in the class definition . . . . Allstate should have paid to replace all such systems.

2. Allstate engages in a series of uniform practices that are unsound from an engineering standpoint, and that prevent Allstate from detecting or recording its policyholders' seatbelt damage. These practices are: (1) limiting seatbelt inspection and replacement to cases of airbag deployment; (2) adopting a "Write Only What You Can See" process that cannot detect latent damage such as webbing stretch; (3) failing to adopt adequate seatbelt system inspection procedures or to adequately train its personnel to perform such procedures; (4) failing to require adjusters to consult and adhere to vehicle manufacturer recommendations regarding post-collision seatbelt inspection and/or replacement; and (5) failing to include appropriate fields in its claim processing system, Next Gen, to detect and record seatbelt damage. As a result of these practices, in the majority of cases, Allstate has not paid to replace its policyholders' damaged seatbelts.

3. For future claims handling, Allstate should be required to collect and maintain additional data points

1    relevant to capturing latent seatbelt damage, detecting

2    and recording discernible seatbelt damage, and replacing

3    Allstate's policyholders' damaged seatbelt systems.

4  (Browne Dec. at 32-33.)

5         **4. Admissibility of Browne's first opinion**

6      Browne makes the following assertions in support of her first

7  opinion, *supra*:

8    1.   Federal  Motor  Vehicle  Safety  Standards  require

9         automobile  seatbelt  systems  in  the  United  States  to

10        stretch to a specified extent when subject to specified

11        forces. (Browne Dec. ¶¶ 38 – 43.)

12   2.   "Once stretched, seatbelt webbing never fully returns to

13        its original length." (Browne Dec. ¶ 35.)

14   3.   "Once the webbing is stretched, its capacity to protect

15        the occupant is compromised." (Browne Dec. ¶ 35.)

16   4.   "The   seatbelt   webbing   will   stretch   in   an

17        accident . . . if the seatbelt is loaded with a

18        sufficient degree of force. 'Loaded' is a technical term

19        meaning  the  occupant's  body  contacted  the  restraint

20        system (specifically, the webbing) and applied pressure

21        to  the  restraint  system  during  speed  deceleration."

22        (Browne Dec. ¶ 44.)

23   5.   "Whether the loading caused the webbing to stretch in a

24        given collision depends on two factors: (1) the type of

25        collision, which indicates the principal **direction** of

26        force; and (2) the degree of damage to the vehicle,

19

1  which shows the **amount** of force to which the seatbelt
2  was subjected." (Browne Dec. ¶ 44) (emphasis in
3  original).

4  6.  "For a head-on collision resulting in major damage to
5  the vehicle, I can state with certainty that the
6  seatbelts loaded, that the webbing stretched, and that
7  the seatbelt system is therefore damaged . . . . I can
8  also state with certainty that seatbelt damage occurs in
9  other types of collisions . . . [because] the **direction**
10 of force, combined with the degree of damage (**amount** of
11 force), necessarily results in seatbelt loading and
12 therefore damaged seatbelt webbing. It happens because
13 of the uniform laws of physics controlling all
14 collisions, and because of the uniform properties of all
15 seatbelt webbing . . . ." (Browne Dec. ¶ 47) (emphasis
16 in original).

17 7.  "If one's goal is to restore a vehicle to its pre-
18 accident condition, then the entire seatbelt system must
19 be replaced. It is not possible to repair the webbing,
20 nor is it possible to replace only the webbing in a
21 seatbelt system. Rather, the entire system, including
22 the webbing, must be removed and a new system
23 installed." (Browne Dec. ¶ 36.)

24 8.  "I have carefully reviewed screen shots showing the
25 fields of data collected by [Allstate's Legacy and Next
26 Gen computer systems]." (Browne Dec. ¶ 48.) "Attached

1    [to my declaration are matrices] that I prepared based
2    on my review of screen shots . . . . [These matrices
3    identify] the fields of data that, when pulled from the
4    [Legacy and Next Gen computer systems] by a computer
5    technician, will yield a list of claims involving
6    collisions in which the seat belt systems were damaged."
7    (Browne Dec. ¶ 49, 56.)

8    All of these assertions must pass muster under Rule 702 and
9    Daubert in order for Browne's first opinion to be admissible as
10   expert testimony.

11   Given Ms. Browne's training and experience, I would find that
12   the first seven assertions — that a loaded seatbelt subjected to
13   sufficient force in a particular direction in an auto collision
14   will stretch and not return to its original shape, thereby
15   rendering it unsafe for future use; that head-on collisions causing
16   major damage to vehicles and certain other types of collisions
17   subject loaded seatbelts to the requisite force; and that to
18   restore such seatbelts to safe condition, one must replace the
19   entire seatbelt system, rather than just the webbing — are
20   admissible.

21   This leaves Browne's assertion that, based on a review of
22   screen shots of Allstate's Legacy and Next Gen computer systems,
23   she can identify the "fields of data that . . . will yield a list
24   of claims involving collisions in which the seat belt systems were
25   damaged." (Browne Dec. ¶ 49, 56.) In other words, Browne claims
26   that she can infer from Allstate's computer record of a collision

21

1  whether the seatbelts were irreparably damaged in that collision.

2  According to Browne, certain fields in Allstate's systems ("Degree

3  of Damage" and "Was a case or report created?" in the Next Gen

4  system; "Was the asset damaged in this loss?," "Calculated Degree

5  of Damage," and "Was a report filed?" in the Legacy system)

6  indicate the amount of force, while other fields ("Loss Type" and

7  "Detailed Loss Type" in the Next Gen system; "Loss Facts/Auto,"

8  "Insured Vehicle Action," and "Insured Vehicle Road Type" in the

9  Legacy system) indicate the direction of force.[7] (Browne Dec.

10  ¶¶ 51, 52, 58.)

11      Browne's assertion that she can identify vehicles whose

12  seatbelts ought to have been replaced from the information in

13  Allstate's computer systems is critical to the certification

14  inquiry. Plaintiff seeks to certify a class of individuals, among

15  other things, "whose loss involved a collision of sufficient

16  severity to damage the seat belt systems in occupied seating

17  positions." The only means plaintiff offers to ascertain these

18  individuals' identities is by selecting the appropriate fields in

19  Allstate's computer systems. Browne's opinion is critical to

20  establishing that the class members' seatbelt systems were damaged

21  in the identified collisions, because absent her opinion, there is

22  no way to correlate Allstate's claims data with the extent of

23

24      [7] Each of these fields record descriptive categories of
    information, such as "Minor," "Moderate, "Major," and "Possible
25  Total Loss" in the "Degree of Damage" field or "Changing lanes,"
    "Head-on collision," "Insured hit a fixed object," etc. in the
26  "Detailed Loss Type" field. (See Browne Dec. Exs. B, C.)

1 | damage to the vehicles.

2 | FRE 702(c) requires that, to be admissible, expert testimony
3 | must be "the product of reliable principles and methods." But both
4 | of Browne's declarations in support of this motion lack any
5 | description of the principles or methods she uses to deduce the
6 | degree of damage to seatbelt webbing from the fields in Allstate's
7 | computer systems. There is simply no presentation of her
8 | methodology at all.

9 | In her initial declaration, Browne claims that she is able to
10 | identify the affected Allstate policyholders having "carefully
11 | reviewed screen shots showing the fields of data collected by each
12 | system." (Browne Dec. ¶ 48.) She later adds that she has reviewed
13 | the declaration of Omar Menifee, a defense witness, which "confirms
14 | that [her] reliance on the 'Degree of Damage' field is
15 | appropriate." (Browne Dec. ¶ 55.)

16 | In her reply declaration, Browne justifies her interpretation
17 | of the data in the Allstate systems by citing her professional
18 | opinion, *e.g.*, "I have selected the fields and menu options that,
19 | in my professional opinion, demonstrate that the principal
20 | **direction** of force and the **amount** of force involved in the
21 | collision resulted in seatbelt loading and webbing stretch" (Browne
22 | Dec. ¶ 58) (emphasis in original). In her reply declaration, Browne
23 | adds:

24 | [M]y selection of the data fields for my matrices is
based on the thousands of real-world collisions that I
25 | have examined and evaluated in my career. I am an expert
in accident reconstruction. I have performed thousands
26 | of accident reconstructions. It is precisely because of

23

1   my extensive experience as an accident reconstructionist
    that I can testify that that information on the type of
2   incident in which the vehicle was involved, and
    information on the type of damage the incident caused to
3   the vehicle, are highly relevant facts from which I can
    draw conclusions sufficient to reconstruct the general
4   principal direction and approximate degree of the forces
    involved. Allstate's databases contain facts sufficient
5   for this purpose in its "Degree of Damage," "Calculated
    Degree of Damage," "Loss Facts," "Insured Vehicle
6   Action," "Insured Vehicle Road Type," "Was a case or
    report created," "Loss Type," and "Detailed Loss Type"
7   data fields. (Browne Reply Dec. ¶ 86.)

8   Later, she states, "The fields of data I have selected from

9   Allstate's Legacy and NextGen systems contain reliable information

10  of the kind routinely relied on by accident reconstructionists who

11  are trying to piece together an accident after the fact." (Browne

12  Reply Dec. ¶ 87.)

13      But beyond these conclusory assertions, Browne simply fails

14  to explain how she derives her conclusions about which collisions

15  led to unsafe seatbelt stretching from the fields in Allstate's

16  systems. An expert is not forbidden from relying on her experience.

17  But "[i]f the witness is relying solely or primarily on experience,

18  then the witness must explain how that experience leads to the

19  conclusion reached, why that experience is a sufficient basis for

20  the opinion, and how that experience is reliably related to the

21  facts." Fed. R. Evid. 702, Advisory Committee's Note to the 2000

22  Amendments. Browne's declarations fail to meet this standard. While

23  it may be true, as Brown avers, that by experience she can

24  determine that the fields reflect particular types of real-world

25  accidents, she does not take the next, necessary step of relating

26  that conclusion to degrees of damage to seatbelt systems.

1    Moreover, none of the factors identified by <u>Daubert</u> and <u>Kumho</u>

2  <u>Tire</u> as indicia of reliability for expert testimony are present in

3  Browne's testimony. There is nothing to indicate that Browne's

4  methodology "can be (and has been) tested." <u>Daubert</u>, 509 U.S. at

5  593. Browne does not indicate that she has examined Allstate-

6  insured vehicles involved in collisions and attempted to correlate

7  the degree of seatbelt stretching to the fields in Allstate's

8  database. Granting that it would have been difficult to obtain

9  sample vehicles for such a study in discovery (*e.g.*, for reasons

10  of consumer privacy), Browne does assert that "the type of incident

11  in which the vehicle was involved, and information on the type of

12  damage the incident caused to the vehicle, are highly relevant

13  facts from which I can draw conclusions sufficient to reconstruct

14  the general principal direction and approximate degree of the

15  forces involved." (Browne Reply Dec. ¶ 86.) In other words, she is

16  arguing that generic information about "the type of incident in

17  which the vehicle was involved" and "the type of damage the

18  incident caused to the vehicle" is sufficient to determine seatbelt

19  stretching. This suggests that she should be able to conduct real-

20  world tests of accidents to see whether her categories of "type of

21  incident" and "type of damage" correlate with seatbelt damage. But

22  not only does she fail to describe testing of her methodology by

23  herself or others, she does not even describe her methodology.

24    Browne similarly neglects to mention whether her methodology

25  "has been subjected to peer review and publication." <u>Id.</u>, 509 U.S.

26  at 593. While publication "does not necessarily correlate with

25

1  reliability" and is "not [a] dispositive consideration in assessing

2  the scientific validity of a . . . methodology," id. at 593-4, the

3  absence of such citation suggests that Browne's methodology is

4  personal, rather than generally-accepted. This absence is

5  particularly striking given her statement that "[t]he fields of

6  data [she has] selected from Allstate's Legacy and NextGen systems

7  contain reliable information of the kind routinely relied on by

8  accident reconstructionists who are trying to piece together an

9  accident after the fact." (Browne Reply Dec. ¶ 87.) There is

10 nothing, however, describing these routine techniques and their

11 reliability, and then relating them to seatbelt damage. Similarly,

12 Browne fails to cite any "standards controlling [her methodology's]

13 operation," id. at 594, among the accident reconstruction

14 community.

15     Finally, there is no description of the "known or potential

16 rate of error" in Browne's methodology. Id. at 594. As the Supreme

17 Court has noted, when considering "experience-based testimony[, i]n

18 certain cases, it will be appropriate for the trial judge to ask,

19 for example, how often an engineering expert's experience-based

20 methodology has produced erroneous results . . . ." Kumho Tire, 526

21 U.S. at 151. There is no requirement that Browne's methodology must

22 be infallible in order to pass muster for reliability under Rule

23 702. But it is difficult to assess her methodology's reliability

24 without some sense of the number of false positives, if any, it is

25 likely to include.

26     Ultimately, Browne is asking the court to make an inferential

1  leap from the data in Allstate's computer systems to the alleged

2  degree of damage to seatbelt systems based solely on her

3  experience, without any explanation of her methods or justification

4  for their reliability. Accordingly, the court is left to conclude

5  that "there is simply too great an analytical gap between the data

6  and the opinion proffered" by Browne to allow its admission.

7  Joiner, 522 U.S. at 146. Or as the Ninth Circuit put it, "We've

8  been presented with only the experts' qualifications, their

9  conclusions and their assurances of reliability. Under Daubert,

10  that's not enough." Daubert v. Merrell Dow Pharmaceuticals, Inc.,

11  43 F.3d 1311, 1319 (9th Cir. 1995) ("Daubert II").[8]

12        In sum, Browne has failed to provide any basis for determining

13  that the methodology she uses to identify collisions that require

14  seatbelt replacement, based on the data in Allstate's computer

15  systems, is reliable. Therefore, the opinion she advances that is

16  based on this methodology - that "Allstate's Next Gen and Legacy

17  systems contain information sufficient to conclude that the

18  Allstate policyholders in the class experienced a 'collision of

19  sufficient severity to damage the seat belt systems in occupied

20  seating positions'" (Browne Dec. ¶ 95) - is also inadmissible for

21  purposes of deciding the motion for class certification. As this

22  opinion is the basis of the class that plaintiff seeks to certify,

23

24        [8] The court wishes to be clear.  It may be that some or indeed
   many of the cars identified by the plaintiff have had seat belt
25  impairment.  The problem is, given the expert's reticence, it is
   impossible to identify which cars may have been subject to that
26  loss, and which cars may have been free of that loss.

1  it follows that the court must deny the motion for class
2  certification.

3      Given the court's disposition of the motion, the court need
4  not further examine Browne's conduct relative to a failure to cite
5  the article from which she took about ten (10) paragraphs of her
6  declaration, making it appear that she was the author of the
7  material.  It suffices to say such conduct is unacceptable.

8  **IV. CONCLUSION**

9      Accordingly, the court hereby orders as follows:

10     [1] Defendant's motion to compel appraisal and stay this
11     action is DENIED.

12     [2] Defendant's objection under Federal Rule of Evidence 702
13     to the admissibility of the declaration of Sandy Browne is
14     SUSTAINED.

15     [3] Plaintiff's motion for class certification is DENIED
16     without prejudice.

17     [4] Defendant's request for an evidentiary hearing is DENIED
18     as moot.

19     [5] Defendant's motions to strike and objections to the
20     declarations of plaintiff's proposed experts Reed F. Simpson
21     and James Mathis are DENIED as moot.

22     [6] Plaintiff's motions to strike and objections to the
23     declarations of defendant's proposed experts Tony Passwater,
24     Omar Menifee, Daniel Davee, and Robert C. Lange are DENIED as
25     moot.

26     [7] Allstate's request to seal documents stands SUBMITTED,

1    and an appropriate order will issue.

2    IT IS SO ORDERED.

3    DATED:   January 16, 2013.

6    _____
     LAWRENCE K. KARLTON
7    SENIOR JUDGE
     UNITED STATES DISTRICT COURT

29